UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

John Doe,                                                    Case No. 3:22-cv-140

        Plaintiff,

   v.                                                       MEMORANDUM OPINION
                                     AND ORDER

Bowling Green State University, *et al.*,

        Defendants.

## I.     INTRODUCTION AND PROCEDURAL BACKGROUND

On January 27, 2022, Plaintiff John Doe filed a verified complaint against Bowling Green

State University ("BGSU"), and five of its employees[1] in their official and individual capacities,

seeking (1) declaratory judgment that the Defendants had violated his federal and state constitutional

right to due process, and (2) injunctive relief redressing the harm from this due process violation.

(Doc. No. 1).  At the same time, Doe filed a motion to proceed under a pseudonym which has been

fully briefed.  (*See* Doc. Nos. 3, 6, 13).

In lieu of answering, Defendants moved to dismiss the complaint under Federal Rules of

Civil Procedure 12(b)(1), (b)(2), and (b)(6).  (Doc. No. 14).  In response, Doe filed a first amended

verified complaint ("FAC") as a matter of course pursuant to Rule 15(a)(1)(B).  (Doc. No. 15); Fed.

R. Civ. P. 15(a)(1)(B).  Defendants responded again with a motion to dismiss asserting dismissal

under the same rule provisions as before.  (Doc. No. 16)  Doe opposed this motion on June 13,

---

[1] The individual Defendants are Christopher Bullins, Jeremy Zilmer, Dr. Maureen Wilson, Jodi Webb, and Rodney Rogers.

2022, (Doc. Nos. 17 & 18),[2] but then subsequently moved for leave to amend his complaint a second time and filed a proposed Second Amended Complaint ("SAC").  (Doc. No. 19). Defendants opposed the motion for leave to amend as futile, (Doc. No. 22), and Doe filed a reply. (Doc. No. 23).

I will begin with an analysis of Defendants' second motion to dismiss[3] and then proceed into an analysis of Doe's request for leave to amend the FAC.  Lastly, I consider whether Doe may proceed pseudonymously in this litigation.

## II. BACKGROUND[4]

Doe was formerly an undergraduate student at BGSU pursuing a Bachelor of Arts degree. (Doc. No. 15 at 3).  He was slated to graduate no later than the spring of 2022 but last attended BGSU in the spring of 2021.  (*Id.* at 3-4).  In the fall of 2019, Doe pledged to the Pi Kappa Alpha ("PIKE") fraternity.  (*Id.* at 23).

On March 4, 2021, PIKE hosted a Big/Little event during BGSU's pledge week.  (*Id.* at 10). Approximately 30 individuals attended the event, including 9 new pledges to PIKE.  (*Id.*).  This event took place at an off-campus residence and the individuals were "situated throughout [the] residence in different rooms and/or areas."  (*Id.*).  Among the new pledges was Stone Foltz, who after attending the event, tragically passed away on March 7, 2021, from fatal ethanol intoxication. (*Id.*).

---

[2] Defendants responded to Doe's opposition, (Doc. No. 20), and thus, the second motion to dismiss is decisional.

[3] Defendants first motion to dismiss was mooted by the filing of the FAC and Defendants' subsequent motion to dismiss.  Thus, I will deny Defendants' first motion to dismiss without prejudice as moot.  (Doc. No. 14).

[4] These facts are drawn from the FAC.

In response to Foltz's death, BGSU President Defendant Rodney Rogers issued a press release stating "BGSU will complete a thorough and fair investigation, seeking the truth and facts, and holding all students and groups responsible." (*Id.* at 7, 10).  On March 15, 2021, the Ohio Attorney General appointed a Special Counsel on behalf of BGSU to investigate the PIKE event and determine whether it had contributed to Foltz's untimely death.  (*Id.* at 11).  Shortly thereafter on April 2, 2021, Rogers announced the creation of an anti-hazing work group that would be co-chaired by Defendants Dr. Maureen Wilson[5] and Christopher Bullins.[6]  (*Id.*).  During this investigation, and in conjunction with counsel, Defendant Jeremy Zilmer[7] interviewed 32 individuals[8] regarding the events of March 4, 2021.  (*Id.* at 12).

On May 14, 2021, Zilmer sent Doe a charge letter citing violations of the Student Code of Conduct ("Code") and alleging violations were done "both directly and through tradition."  (*Id.*). Doe was later notified by Bullins that a hearing would be held on the charges on July 7-8, 2021. (*Id.*). The notice stated Doe would undergo a group hearing, along with "other Respondents facing the same or similar [Code] charges because those alleged violations arise from the same incident."  (*Id.* at 13).  It also stated, "Each Respondent will have the opportunity to present information and cross-examine witnesses and other Respondents."  (*Id.*).  Doe raised concerns about the group hearing to Bullins and in response, Bullins informed Doe that he could submit objections in writing.  (*Id.*).

---

[5]  Wilson is the Associate Dean for Faculty and Student Affairs and a Professor of the College of Education and Human Development at BGSU.  (Doc. No. 15 at 6).

[6]  Bullins is the Dean of Student Affairs for BGSU.  (*Id.* at 4).

[7]  Zilmer is the Associate Dean of Student Affairs at BGSU.  (*Id.* at 5).

[8]  Zilmer tape recorded the 32 interviews.  (*Id.* at 12).

On June 17, 2021, Bullins provided Doe with a notice of the proposed panel members for the University Conduct Committee ("UCC")[9] which would hear the charges against Doe and the others.  (*Id.* at 14).  This notice informed Doe he could challenge the inclusion of panel members on the grounds of conflicts of interest.  (*Id.*).

The Code mandates specific composition of the UCC.[10]  (*Id.*).  Doe challenged the inclusion of four proposed panel members (one staff member and three graduate students) asserting they could not be impartial.  (*Id.* at 14-15).  On June 23, 2021, Bullins informed Doe that the proposed staff member had been replaced on the panel but the graduate students would remain.  (*Id.* at 15).

Around the same time, Doe made a written request to have a separate hearing from the other Respondents, but Bullins denied the request.  (*Id.*).  Doe also learned that the "Respondents will not be compelled to testify."  (*Id.*).

On June 23, 2021, Doe made a written request to remove certain statements from the charges he believed to be inflammatory and prejudicial.  (*Id.* at 16).  Particularly, he objected to:

> At the event, members of the organization provided individual bottles of alcohol to new members and encouraged new members, both directly and through tradition, to consume most or all of their contents to the point of sickness thereby endangering the health of and attempting to cause harm to new members.  One new member died following the event and other new members were severely intoxicated to the point of vomiting.  The new member's, Stone Foltz, death (sic) has subsequently been attributed to 'fatal ethanol intoxication during a hazing incident' per the Lucas County Coroner's Office.

(*Id.*).  Bullins refused to remove the language and informed Doe he would have an opportunity to address the statement during the hearing.  (*Id.* at 16-17).

---

[9] The UCC operates similarly to a jury.  (*Id.* at 6).

[10] The UCC is composed of faculty, staff, and students.  (Doc. No. 16-1 at 8); *see also Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (a court may consider exhibits attached to a defendant's motion to dismiss).  For a hearing to proceed, five members must be present, including one faculty member, one staff member and three students.  All members of the UCC, except the Chair, have voting rights.  Decisions of the UCC are made by majority vote.

On July 1, 2021, Doe received a hearing packet that included information and materials in advance of the formal hearing.  (*Id.* at 17).  The packet included the following materials:

- Incident report for each Respondent prepared by Zilmer and/or Bullins
- Summary of investigation for each Respondent drafted and prepared by Zilmer and/or Bullins, which included unauthenticated and hearsay statements from pledges
- Conduct Charge correspondence dated May 14, 2021, for each Respondent prepared by Zilmer
- Case Resolution Record for each Respondent prepared by Zilmer and/or Bullins
- Tape recordings of interviews with some Respondents
- Bowling Green Police Department incident/investigation report
- Communications Event Report from unidentified source
- PIKE New Member Handbook for Spring 2021
- Witness list for the UCC hearing prepared by Zilmer

(*Id.*).  The UCC received these same materials.  (*Id.*).

On July 7, 2021, Doe and two other Respondents appeared for their conduct hearing.  (*Id.* at 20).[11]  Four Respondents failed to appear and although the UCC had recordings of statements made by these Respondents (and a summary of their statements prepared by Zilmer), Doe was not able, of course, to cross-examine the Respondents that did not appear.  (*Id.*).  Additionally, Doe was unable to cross-examine his alleged accuser[12] even though the summary document and argument presented by Zilmer at the hearing included out-of-court statements from the accuser.  (*Id.* at 18).  Bullins[13] permitted these out-of-court statements over Doe's objection.  (*Id.*).

---

[11] On the second day of the hearing, only Doe and one other Respondent appeared.  (Doc. No. 15 at 20).  Doe does not name the other Respondents in the FAC.

[12] The FAC does not identify the alleged accuser.

[13] During the hearing, Bullins acted as the Chair, a role similar to a judge.  (*Id.* at 5).

During the hearing, Zilmer[14] called numerous witnesses[15] and questioned the two other Respondents about the allegations against Doe.[16]  (*Id.* at 20).  Despite this, Doe alleges "[n]one of the witnesses nor Respondents questioned were able to provide any reliable and/or firsthand testimony against Doe" to support the charges.  (*Id.*).  Further, Zilmer admitted he had no evidence that Doe had interacted with Stone Foltz on the night in question.  (*Id.*).

Doe also raised questions about the Spark program.  (*Id.* at 26).  Spark was a training program for the Greek community concerning "hazing, consent and alcohol consumption" which Doe was required to attend by BGSU in 2019 when he pledged to PIKE.  (*Id.* at 22-23).  Doe alleges Spark "directly contradicts the hazing and alcohol policy contained in the [Code]."  (*Id.* at 23).

Zilmer testified, "I can't speak to what the curriculum says . . . I do not have knowledge of the Spark program."  (*Id.* at 26).  At some point in the hearing, Bullins interjected to inform Doe that Zilmer's role was "student conduct" and the office that would have hosted Spark was "fraternity/sorority life."  (*Id.*).  Along the same line, Bullins repeatedly questioned the relevance of Doe's inquiries regarding Spark.  (*Id.* at 32).  Doe alleges Spark was sponsored by the Dean of Students, the department in which Zilmer and Bullins were employed.  (*Id.* at 26, 31).

Furthermore, Doe alleges Bullins and Zilmer permitted the charges to be brought under the Code and completely ignored Spark training, which was a specific hazing and alcohol policy for fraternity members.  (*Id.* at 32).  Doe alleges the existence of these two policies made BGSU's position on hazing and alcohol "vague and ambiguous."  (*Id.*).

---

[14] Zilmer acted as the Student Conduct Administrator, a role similar to a prosecuting attorney.  (*Id.* at 5).

[15] The FAC does not identify the names of these witnesses.  (*Id.* at 20).

[16] The FAC does not detail the substantive charges at issue.  (*See id.*).

6

Doe also alleges bias on Bullins' behalf when he made decisions regarding the relevance and admission of evidence at the hearing, including the failure to remove language from the charge Doe believed to be prejudicial and inflammatory.  (*Id.* at 30).  Bullins also allegedly "repeatedly interrupted Doe and stated his questions were not relevant, rephrased questions posed by Zilmer, or testified for Zilmer."  (*Id.*).  Additionally, Bullins questioned the relevance of Doe's inquiries regarding a tradition of hazing, and rephrased questions to or assisted Zilmer with his responses.  (*Id.* at 31).

 On July 12, 2021, Doe received an outcome letter informing him he was being held responsible for all charges and sanctioned him with: (1) an eight-year suspension; (2) a permanent notation of suspension on his academic transcript; (3) an official hold on his registration file; and (4) a prohibition from entering the BGSU campus.  (*Id.* at 27).

Doe timely appealed the decision on July 20, 2021, to Defendant Jodi Webb.[17]  (*Id.*).  Doe alleges that the next day he learned that Bullins and Wilson[18] were the co-chairs of the anti-hazing work group.  (*Id.* at 28).  He immediately submitted evidence demonstrating both Bullins and Wilson participated in this work group to Webb and argued that neither was an impartial decision maker. (*Id.*).  While Webb accepted this information from Doe, she stated she would not consider it on appeal because Doe had submitted the information after the deadline to appeal had passed.  (*Id.*). Webb denied Doe's appeal on July 30, 2021.  (*Id.*).

Also on July 30, 2021, BGSU released its anti-hazing report from the anti-hazing work group co-chaired by Bullins and Wilson.  (*Id.* at 29).  The report recommended a zero-tolerance policy for hazing in the future.  (*Id.*).  Doe alleges this is "obvious and direct evidence" that he did not receive a fair hearing from Bullins or Wilson.  (*Id.* at 29-30).

---

[17] Webb is the Associate Vice President for Student Affairs at BGSU.  (*Id.* at 6).

[18] Wilson served on the UCC that heard the case against Doe.  (*Id.*).

As to Rogers, Doe alleges his appointment of Bullins and Wilson to the anti-hazing work group, despite knowing (or being able to know) that both Bullins and Wilson would play roles at the hearing, was evidence of an unfair procedure. (*Id.* at 34). He also alleges Rogers knew Zilmer would play a role at the hearing but permitted him to participate in the anti-hazing work group. (*Id.* at 29, 34). Thus, Rogers permitted a biased hearing to occur when he let the "judge", "prosecutor", and a "jury member" serve on an anti-hazing work group while also rendering judgment on a hazing disciplinary case. (*Id.* at 35).

Doe asserts three counts for relief arising from these events. First, he seeks a declaratory judgment against all Defendants that BGSU's hearing process violated his Due Process rights under both the U.S. and Ohio Constitutions. (*Id.* at 35-37). Specifically, he alleges biased decision-makers, the improper admission of hearsay testimony, the inability to cross-examine witnesses and his accuser, the inclusion of prejudicial and inflammatory statements in the charges, and the application of the Code to him were all evidence of an unfair hearing process. (*Id.*). Second, Doe seeks a declaratory judgment against the individual Defendants in their individual capacities for damages resulting from the same alleged violations of his Due Process rights under the U.S. Constitution. (*Id.* at 37-38). And finally, he seeks injunctive relief against the individual Defendants in their official capacity from imposing a penalty on Doe, reporting Doe's discipline, and for name-clearing. (*Id.* at 38-39).

### III. ANALYSIS

#### A. MOTION TO DISMISS

On a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Royal Truck & Trailer Sales and Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020). But legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 550 (2007).  "Against this backdrop, we ask whether the complaint contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)) (internal quotation marks omitted).  "Plausibility is a context-specific inquiry, and the allegations in the complaint must permit the court to infer more than the mere possibility of misconduct[.]"  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 1.  Due Process (Count One)

In Count One, Doe requests a declaratory judgment that Defendants' actions violated his due process rights under the Fifth and 14th Amendments and his right under Section 16, Article I, of the Ohio Constitution that guarantees every person shall have a remedy by "due course of law." But the 11th Amendment and sovereign immunity bar me from hearing this claim.

"To the extent that the State of Ohio – and, thus, its agencies and its employees acting in their official capacities – has waived its sovereign immunity from liability for violations of state law, it has consented to be sued only in Ohio's court of claims."  *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 840 (6th Cir. 2020) (citing Ohio Rev. Code § 2743.02(A)(1)).  Furthermore, "§ 1983 does not authorize suits for violations of state constitutional law, and Ohio law does not authorize private suits for violations of the Ohio Constitution."  *Moore v. City of Cleveland*, 388 F. Supp. 3d 908, 919 (N.D. Ohio 2019).  In his opposition, Doe made no argument challenging dismissal of this claim, and thus, has abandoned it.  *See Doe v. Bresden*, 507 F.3d 998, 1007-08 (6th Cir. 2007).  Accordingly, I dismiss the state constitutional claim in Count One.

Similarly, the 11th Amendment's grant of sovereign immunity to states precludes consideration of Doe's § 1983 claims[19] in Count One against the Defendants in their official capacity. *See Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (immunity granted "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens."). BGSU, as a public state university, qualifies as an arm of the state, and therefore, the 11th Amendment bars suits against BGSU in federal court. *Underfer v. Univ. of Toledo*, 36 F. App'x 831, 834 (6th Cir. 2002); (*see also id.*) ("[T]his Court has held that public-funded universities are not considered 'persons' under § 1983 and are immune from actions under this section.").

Likewise, the claim against the individual Defendants in their official capacity "are no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). In his opposition, Doe did not argue against dismissal of these claims, and thus, he has abandoned them as well. *See Bresden*, 507 F.3d at 1007-08. Accordingly, I dismiss the § 1983 claim in Count One against BGSU and the individual Defendants, in their official capacities.

### 2. § 1983 claim for injunctive relief against the individual Defendants in their official capacity (Count Three)

An exception to the 11th Amendment bar against suing the state arises where a plaintiff seeks prospective injunctive relief for an ongoing violation of federal law against a state official in their official capacity; otherwise known as an *Ex parte Young* claim. *Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). This is because "federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507-08 (6th Cir. 2008). But this exception is narrow, and "does not permit judgments

---

[19] Claims brought under the U.S. Constitution are enforced through 42 U.S.C. § 1983. *See, e.g., Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119-20 (1992) (reiterating that § 1983 provides the cause of action for all citizens injured by a violation of their federal constitutional rights).

against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993).

Defendants argue Doe's complaint does not state an *Ex parte Young* claim because there is no ongoing violation at issue. Instead, the FAC alleges the individual Defendants' past conduct both before and during the disciplinary hearing resulted in a due process violation. (Doc. No. 16 at 11-13). In opposition, Doe makes no argument regarding the present or past nature of the alleged violation, but argues he properly alleged an *Ex parte Young* claim because his request seeks prospective relief in the form of "both reinstatement at [BGSU] and a name clearing hearing." (Doc. No. 17 at 11).

Although Doe pleads his request as one for injunctive relief from the "continued actions" of the individual Defendants under the Code, (Doc. No. 15 at 39), "the Supreme Court has instructed courts to look to the substance of the legal claim, not its formal description." *S & M Brands*, 527 F.3d at 509. A review of the FAC's allegations at Count One (and as incorporated in Count Three) demonstrate that Doe is seeking relief from past procedural due process violations, not ongoing ones.

For example, Doe lists five alleged due process violations, all of which occurred before or during the July 7-8, 2021 hearing. (*Id.* at 36-37) (*e.g.*, "BGSU conducted a fundamentally unfair disciplinary process by permitting the submission of hearsay evidence to the UCC panel members . . . without providing the Plaintiff the opportunity to effectively cross-examine witnesses."). While the effects of these past alleged violations may be ongoing in the form of Doe's disciplinary penalty, the alleged violative act itself is done and, as applied to Doe, will not recur. *See, e.g., S & M Brands*, 527 F.3d at 509 (dismissing *Ex parte Young* claim where "[p]laintiffs are asking the federal court for relief for a past, one-time decision of the Attorney General that purportedly violated their federal constitutional rights."); *Gean v. Hattaway*, 330 F.3d 758, 776 (6th Cir. 2003) (affirming dismissal

where "[t]he[ ] complaint is . . . based entirely upon past acts and not continuing conduct that, if stopped, would provide a remedy to [plaintiff].").

What Doe seeks is "retrospective injunctive relief – that the University undo something that had already been completed," *Lipian v. Univ. of Michigan*, 453 F. Supp.3d 937, 955 (E.D. Mich. 2020) (denying jurisdiction over *Ex parte Young* claim), but that request is not covered by the *Ex parte Young* exception and thus, Count Three must be dismissed for lack of subject-matter jurisdiction.

### 3.   § 1983 claim against individual Defendants in their individual capacity (Count Two)

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments." *Matthews v. Eldridge*, 424 U.S. 319, 322 (1976).  A student faced with serious school disciplinary proceedings, such as those that result in suspension or expulsion, have the right to procedural due process.  *Goss v. Lopez*, 419 U.S. 565, 576 (1975).

The procedural due process violations identified by Doe in the FAC are: (1) Bullins and Wilson were biased decision-makers because of their participation in an anti-hazing work group that took place during the UCC proceedings; (2) inability to cross-examine witnesses; (3) inability to cross-examine his accuser; (4) the conduct charges and materials provided to the UCC contained prejudicial and inflammatory statements, and hearsay; and (5) Defendants provided conflicting hazing and alcohol policies under the Code and Spark, such that the standards were vague and ambiguous.  (Doc. No. 15 at 36-37).  The individual Defendants alleged Doe failed to state a claim with respect to each of the above, and also, that each individual was entitled to qualified immunity. (Doc. No. 16 at 13).

Because the individual Defendants have raised qualified immunity, the "plaintiff bears the burden of showing that defendants are not entitled to [it]." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).  "At the pleading stage, this burden is carried by alleging facts plausibly making out a

claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable [official] would have known that his conduct violated that right." *Id.* These allegations "must demonstrate that each defendant [official], through his or her own individual actions, *personally* violated plaintiff's rights under clearly established law." *Id.* (citing *Iqbal*, 556 U.S. at 676) (emphasis in *Johnson*); *see also Iqbal*, 556 U.S. at 676 ("Collective failures of responsibility are not actionable under § 1983[.]").

### a.  Fifth Amendment procedural due process claim

I conclude the FAC fails to state a claim for relief under the Fifth Amendment's Due Process Clause.  The Fifth Amendment's prohibition applies only to the United States.  *Dusenbery v. U.S.*, 534 U.S. 161, 167 (2002); *see also Scurlock v. Ohio*, 2020 WL 1066376, at *2 (N.D. Ohio March 5, 2020).  Because Doe makes no allegations that any of the individual Defendants were U.S. government officials, or acting on behalf of the U.S., this claim is dismissed.

### b.  14th Amendment procedural due process claim

To establish a procedural due process claim in violation of the 14th Amendment, a plaintiff must show: (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford adequate procedural rights. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

### i.  Deprivation of a property interest

Doe asserts his property interest in continued enrollment at BGSU was deprived when he was subject to an eight-year suspension.  (Doc. No. 17 at 10) (citing Doc. No. 15 at 36).  "Suspension 'clearly implicates' a protected property interest[.]"  *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).  Thus, "a state-university student facing a significant disciplinary decision . . . is entitled to 'minimum due process protections.'"  *J. Endres v. N.E. Ohio Med. Univ.*, 938 F.3d 281,

297 (6th Cir. 2019) (citing *Univ. of Cincinnati*, 872 F.3d at 399) (finding a two-year suspension was sufficient deprivation to trigger due process protections).

But the question remains: What process is due?  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "While the exact outlines of the process may vary, universities must 'at least' provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker."  *Univ. of Cincinnati*, 872 F.3d at 399 (citing *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016)).  But "universities are not courts, and an accused student cannot expect the same procedural safeguards as a criminal defendant."  *J. Endres*, 938 F.3d at 297; *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) ("Courts have generally been unanimous . . . in concluding that hearings need not be open to the public, that neither the rules of evidence nor the rules of civil or criminal procedure need be applied, and witnesses need not be placed under oath.") (internal citations omitted).

### ii. Admission of prejudicial, inflammatory, or hearsay statements is not a violation of procedural due process

The rules of evidence do not apply in student conduct hearings.  *Flaim*, 418 F.3d at 635. Hearsay is a rule delineated in the Federal Rules of Evidence, and "a university student 'has no right to use [ ] formal rules of evidence' at his disciplinary hearing.'"  *Univ. of Cincinnati*, 872 F.3d at 405 (quoting *Flaim*, 418 F.3d at 635).  Thus, the admission of summaries that included hearsay (or otherwise unauthenticated) statements was not a violation of procedural due process.  *See id.* ("UC may still open the hearing with a [ ] report summary that includes the parties' 'out-of-court' statements, and the [ ] panel may still rely on those statements in deciding whether Doe is responsible for violating the Code of Conduct.").

14

For the same reason, Doe cannot base his procedural due process claim on the inclusion of prejudicial or inflammatory statements within the charges against him.[20] The potential exclusion of prejudicial or inflammatory statements implicates Federal Rule of Evidence 403, but these rules need not apply to satisfy due process. *Id.* Even if statements in the charges were prejudicial or inflammatory, Doe was given an opportunity at the hearing to explain or defend against those statements. *See Flaim*, 418 F.3d at 635 (meaningful hearings provide the accused the opportunity to "respond, explain, and defend").

Thus, Doe has failed to state a claim for a violation of procedural due process, I dismiss this claim against all individual Defendants.

### iii. Existence of the Code and Spark does not create an unconstitutionally vague standard

"Due process requires that a state enactment is 'void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion or exclusion.'" *Wilson v. Johnson*, 247 F. App'x 620, 626 (6th Cir. 2007) (quoting *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358-59 (6th Cir. 1998)). Additionally, "[t]he absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuses by enabling the official to administer the policy on the basis of impermissible factors." *United Food*, 163 F.3d at 359.

Doe argues the existence of the Code and Spark created conflicting standards regarding hazing and alcohol such that the Code was void for vagueness. (Doc. No. 17 at 11) ("Rogers, Bullins and Zilmer, based and instituted charges against Doe relying on the [Code] alcohol and hazing policy after teaching an alternative and conflicting alcohol and hazing policy (Spark) . . .").

---

[20] Doe appears to abandon this as a basis for his procedural due process claim as he presented no argument in his opposition challenging its dismissal. (*See* Doc. No. 16 at 9-13); *see also Bresden*, 507 F.3d at 1007-08.

At the outset, I conclude the allegations against Rogers do not state a claim for a due process violation for imposition of alleged conflicting standards.  *See Johnson*, 790 F.3d at 653 (allegations must demonstrate what each individual personally did to violate plaintiff's rights).  There are no allegations that Rogers was responsible for determining the charges against Doe and no allegations that Rogers was involved with, or had responsibility for Spark, aside from his general role as President of BGSU.  (*See* Doc. No. 15); *see also Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another.").  Thus, as to Rogers, Doe has failed to adequately plead his claim.

Bullins and Zilmer charged Doe with violations of the Code, not Spark.  (Doc. No. 15 at 12, 31-32).  The Code is explicit in its prohibition against both hazing and provision of alcohol to underage students.  (Doc. No. 16-1 at 2-5).[21]  Doe alleges in his FAC that BGSU provided no training on the Code, (Doc. No. 15 at 25), but this does not implicate a due process violation.  "[T]he University is under no obligation to ensure every person has specific notice of its policies.  Its policies were published and generally available to anyone interested in learning them."  *Wilson*, 247 F. App'x at 626-27.

Doe makes further allegations that Spark created a vague standard because nowhere did Spark inform Doe that allowing an underage person to drink may be a crime or a Code violation.  (*Id.* at 25).  But such allegations do not create vagueness, instead it prompts the invocation of a common legal maxim: "Ignorance of the law is no defense."  *U.S. v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005).

---

[21]  I may consider exhibits attached to Defendants' motion to dismiss so long as they are referred to in the complaint and central to the claims.  *Bassett*, 528 F.3d at 430.  Doe placed the language of the Code directly at issue when he challenged it as void for vagueness.  (*See* Doc. No. 15 at 37).

Yet, Doe also makes other specific allegations about Spark, including alleged action steps for dealing with underage drinking, (*id.* at 24-25), that at the very least raise the question of what the Spark training taught Doe.[22]  But there is no allegation that Bullins or Zilmer sought to apply any other standard to Doe besides the Code.  (*See id.* at 31-32) (*e.g.*, "Zilmer brought the conduct charges pursuant to the [Code]").  Both Bullins and Zilmer disavowed knowledge of Spark, (*id.* at 26),[23] and thus, Doe was at no risk of being subject to a conflated standard.  *See McGlone v. Cheek*, 534 F. App'x 293, 298 (finding vagueness where the conflation of two policies by university officials indicated that an ordinary person would not be able to determine the applicable standard).

At the time of his hearing, Doe was on notice of the standard that would be applied to his alleged conduct, *i.e.*, the Code.  The Code is explicit in its prohibitions against hazing and underage alcohol use, and a person of ordinary intelligence would be able to identify those prohibitions. (Doc. No. 16-1 at 2-5) (Hazing is listed as "Prohibited Conduct" and is defined by specific reference to eight categories of behavior).  *See Coy ex rel. Coy v. Bd. of Educ. of N. Canton City Schs.*, 205 F. Supp.2d 791, 802 (N.D. Ohio 2002) (noting rules that "do[ ] not give students any indication of what actions or behavior would lead to discipline" are impermissibly vague).

What Doe is really arguing is that Bullins and Zilmer failed to consider mitigation evidence, in the form of Spark; but Doe had the ability to inquire, and did in fact make inquiries, regarding

---

[22] Although Doe submitted the Spark training as an exhibit to his opposition to this motion to dismiss, (*see* Doc. No. 18-1), I cannot consider this exhibit on a Rule 12 motion.  *See Spencer v. Cleveland Clinic Found.,* No. 1:21-cv-1909, 2022 WL 2954175, at *13 (N.D. Ohio July 26, 2022); *see also Bassett*, 528 F.3d at 430 (discussing what courts may consider in deciding Rule 12 motions).

[23] The FAC alleges that Bullins, as the Dean of Students, was aware of Spark since it was offered by the Office of the Dean of Students, *i.e.*, Bullins' department.  (Doc. No. 15 at 23, 26).  But this allegation is equivalent to one that seeks to impose supervisory liability based on Bullins' implied knowledge of the actions of his subordinates.  *See Peatross*, 818 F.3d at 241 ("[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another.").

17

Spark at his hearing.   (*Id.* at 26); *see also Flaim*, 418 F.3d at 635 (meaningful hearings provide the accused the opportunity to "respond, explain, and defend").

For the foregoing reasons, I conclude that Doe has failed to state a claim for a due process violation by Rogers, Bullins, or Zilmer.

### iv.  Failure to state a claim regarding biased decision-makers

In general, "a biased decision maker [is] constitutionally unacceptable[.]"  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  But "[i]t is well established that school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of <u>actual bias</u>."  *Cummins*, 662 F. App'x at 449 (emphasis added).  Thus, "any alleged prejudice on the part of the [decision maker] must be evident from the record and cannot be based in speculation or inference."  *Id.* at 450 (citing *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987)); *see also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 656 (S.D. Ohio 2016) ("To survive a motion to dismiss, [plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias.").  Examples of plausibly alleged claims of actual bias show "personal animosity, illegal prejudice, or a personal or financial stake in the outcome[.]"  *Z. J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 696 (M.D. Tenn. 2018) (citing *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985)).

Doe claims that "[Wilson], [Bullins], and [Webb], all acted improperly when they either engaged on an anti-hazing committee prior to, and during the hearing, or when they failed to consider the biased nature of the participation and subsequent results."  (Doc. No. 17 at 10).  But this is nothing more than a conclusory allegation and, in his opposition, Doe cites to no allegations which would plausibly demonstrate actual bias by each individual.  (*See id.* 9-11); *see Iqbal*, 556 U.S. at 678 (courts are not required to accept conclusory statements as true); *see also Johnson*, 790 F.3d at 653 (allegations must demonstrate what each individual personally did to violate plaintiff's rights).

Even accepting as true the allegation that Wilson and Bullins both served on an anti-hazing work group during the pendency of Doe's disciplinary hearing, this does not show actual bias. Service on a committee intended to address issues of hazing in general does not constitute evidence that Wilson or Bullins were actually biased towards someone charged with committing hazing. *See Gomes v. Univ. of Maine Sys.,* 365 F. Supp. 2d 6, 31-32 (D. Me. 2005) ("There is not exactly a constituency in favor of [hazing], and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone is against [hazing], she would be unable to be a fair and neutral judge as to whether [hazing] had happened in the first place."). Without more, Doe fails to state a plausible claim that either Wilson or Bullins were actually biased against him.

The only allegations against Webb surround her consideration of Doe's appeal. (*See* Doc. No. 15 at 28). Doe makes no allegations from which to infer Webb was actually biased against Doe by refusing to consider his claim of biased decision makers on appeal. Webb declined to consider Doe's appeal regarding biased decision makers because it was untimely. Webb's compliance with the procedural rules for timely appeal as set out in the Code is not evidence of bias and without more, I "will not 'indulge in unreasonable inferences' concerning alleged bias." *Z.J.*, 355 F. Supp. 3d at 696 (quoting *Cummins*, 662 F. App'x at 454).

Accordingly, I dismiss this claim against Bullins, Wilson, and Webb.

### v. Doe sufficiently alleged a violation of his due process right to cross-examine his accuser

The right to cross-examination in disciplinary procedures does not exist in every instance but only "in the most serious cases." *Univ. of Cincinnati*, 872 F.3d at 401 (quoting *Flaim*, 418 F.3d at 636). "[C]ross-examination is 'essential to due process' only where the finder of fact must choose 'between believing an accuser and an accused.'" *Id.* at 405 (quoting *Flaim*, 418 F.3d at 641). Thus, where "a public university has to choose between competing narratives to resolve the case, the

19

university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018).

Doe alleged procedural unfairness because he was unable to cross-examine his accuser[24] at the disciplinary hearing.  (*Id.* at 33).  Doe further alleged this played a role in the outcome of his proceedings because "not one witness [ ] provided any evidence substantiating the charges brought against [him]." (*Id.*; *see also id.* at 20).  In other words, Doe asserts that despite this lack of affirmative evidence, the UCC chose to believe the accuser's version of events over Doe's.

Defendants argue the very presence of witnesses, which Doe was able to cross-examine, demonstrates the process Doe received was fair.  (Doc. No. 20 at 12).  But an accused's right to cross-examination of his accuser is not restricted "exclusively [to] 'he said/she said' [disputes]" and is no "less important in cases where the school's finding rest[s] on the credibility of several witnesses instead of one or two." *Baum*, 903 F.3d at 583.

The substantive record of the disciplinary hearing is not yet part of the record.  As such, important facts such as the nature of the charges, what testimony or evidence was offered to the UCC, what appeared in the written statement of the accuser, and most importantly, the basis of the UCC's decision, including whether it turned on a credibility determination, is unknown at this time. But taking Doe's allegations as true, he has plausibly asserted a violation of his clearly established procedural due process right and should be able to explore this claim through discovery.  *See Baum*, 903 F.3d at 578 (affirming an accused's right to cross-examination where credibility is at issue in serious student misconduct cases is a clearly established right).

---

[24] Doe appears to abandon his theory regarding cross-examination of other witnesses or Respondents as a basis for his procedural due process claim as he presented no argument in his opposition challenging its dismissal.  (*See* Doc. No. 16 at 9-13); *see also Bresden*, 507 F.3d at 1007-08.

The individual Defendants assert qualified immunity requires dismissal of this claim because the FAC does not adequately plead what each individual did to deny Doe his rights. (Doc. No. 20 at 13-15); *see also Johnson*, 790 F.3d at 653. I conclude Doe has failed to allege sufficient facts to state a claim against Rogers, Webb, Wilson, and Zilmer but, at this stage, has adequately pled a claim against Bullins.

The allegations against Rogers imply responsibility because in general, he oversaw the disciplinary process and charges against Doe. (Doc. No. 15 at 8). But Rogers cannot be liable under a theory of *respondeat superior* and the allegations must show "active unconstitutional behavior" on the part of the supervisor. *See Peatross*, 818 F.3d at 241 (quoting *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999)). Doe does not make allegations from which to infer Rogers personally violated Doe's right to cross-examination. Thus, Doe failed to state a claim against Rogers.

Webb's role was to decide Doe's appeal. But the FAC does not include the grounds Doe asserted on appeal to Webb or how Webb's consideration of the appeal was a violation of Doe's right to cross-examine his accuser in the first instance. (*See id.* at 27-28). Thus, there are no facts from which to infer that Webb even considered, let alone violated Doe's alleged right to cross-examination through her resolution of Doe's appeal. I conclude Doe has failed to state a claim that Webb violated his due process rights under this theory.

The FAC is similarly devoid of allegations from which to infer that Wilson, as a member of the UCC, denied Doe his right to cross-examination. (*See id.*). As there are no allegations to demonstrate how Wilson personally violated Doe's right, she is also entitled to dismissal of this claim.

As to Zilmer, Doe alleges that Zilmer presented the summary statement of the accuser, without offering him the chance to cross-examine the accuser, and thus, violated his rights. (*Id.* at 18-19). But this allegation does not assert a violation because BGSU "may still open the hearing

21

with a [ ] report summary that includes the parties' 'out-of-court' statements, and the [ ] panel may still rely on those statements in deciding whether Doe is responsible for violating the Code of Conduct." *Univ. of Cincinnati*, 872 F.3d at 405. The only other inference raised by the allegations is that Zilmer, in his role as the prosecutor of BGSU's case, should have called the accuser at the hearing so Doe could cross-examine him or her. The Code states the accuser is "expected to participate" in the process but there is no mandate that the accuser appear at the hearing. (Doc. No. 16-1 at 7). Even if there was, "there is no guarantee the witness would show. Universities do not have subpoena power." *Id.* Even taking the allegations and inferences in favor of Doe, he has not adequately pled Zilmer violated his right to cross-examination.

This leaves only Bullins. Defendants argue the allegations against Bullins only show that he "made decisions regarding the relevance and admission of evidence" and Bullins' admission of the accuser's hearsay statement does not implicate due process concerns. Nevertheless, Bullins is also alleged to have "responsibility for administering and operating aspects of the BGSU Student Code of Conduct and Judicial System." (Doc. No. 15 at 5). The Code provides that authority over the Code can be delegated, and it has delegated authority over "[q]uestions of interpretation regarding the Code . . . to the Office of the Dean of Students." (Doc. No. 16-1 at 3, 14). Further, the Code provides that the Chair of the UCC, in this case Bullins, "exercise[s] control over the proceedings." (*Id.* at 9; Doc. No. 15 at 5).

Doe's allegations and the language of the Code, taken together, create an inference that Bullins, as Dean of Students, had the authority to determine that Doe's case required the ability to cross-examine his accuser or, in the alternative, that Bullins, as Chair of the UCC, rendered the process procedurally unfair by failing to sustain Doe's objection over his inability to cross-examine his accuser in front of the UCC. Accordingly, I conclude Doe has adequately pled a claim for relief

against Bullins at this stage and thus, Bullins' assertion of qualified immunity is denied without prejudice.

### 4. Conclusion

After review, I conclude that Defendants are entitled to dismissal on all Doe's Counts, except as to Bullins at Count Two under the theory of denial of Doe's right to cross-examination.

Doe also moved for leave to file a SAC "in an effort to address the deficiencies raised in the Defendants' pending motion to dismiss," (Doc. No. 19-1), and Defendants opposed the motion on the grounds that amendment would be futile. (Doc. No. 22). Thus, before dismissing these Counts, I will analyze whether the proposed SAC cures the pleading deficiencies identified.

### B. MOTION FOR LEAVE TO FILE SAC

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2011). Defendants opposed the motion because the SAC, the third iteration of the complaint, would not remedy any of the legal deficiencies identified with regard to Counts One and Three, and added no new, relevant factual allegations which would alter the Defendants' entitlement to dismissal under Count Two. (Doc. No. 22). Defendants are correct that the proposed SAC does not change the formulation of the legal claims asserted at Counts One and Three from that alleged in the FAC and thus, would not alter my conclusion regarding dismissal of those Counts based on sovereign immunity or lack of subject matter jurisdiction.

Doe asserts his proposed SAC would provide additional factual allegations as to three of his theories that he was denied due process: bias, cross-examination, and vagueness. (Doc. No. 23 at 4-6). After comparing the FAC to the proposed SAC, I conclude that Doe has made no new allegations that would cure the identified deficiencies. For example, as to bias Doe argues he sufficiently alleged a claim because Bullins and Wilson served on the anti-hazing committee, Rogers

knowingly appointed them to the UCC, and that Webb failed to consider his claims of biased

decision makers on appeal.  (*Id.* at 4-5).  But all these allegations were made in the FAC, (*see* Doc.

No. 15 at 11, 28-30, 33-34), and do nothing to address the requirement that Doe plead facts

suggesting "actual bias" on the part of each individual Defendant.

Similarly, the allegations he proposes support his vagueness and cross-examination theories

are already found in the FAC.  (*See* Doc. No. 23 at 5-6; *compare* Doc. No. 15 & Doc. No. 19-2).

These would not change the conclusions reached above in my analysis of the Defendants' motion to

dismiss.  Thus, I find that permitting Doe to amend his complaint again would be futile.

### C.  MOTION TO PROCEED UNDER A PSEUDONYM

As a general matter, a complaint must state the name of all parties.  Fed. R. Civ. P. 10(a).  In

certain circumstances a court can permit an individual to proceed under a pseudonym if their privacy

interests substantially outweigh the presumption of open judicial proceedings.  *Doe v. Porter*, 370 F.3d

558, 560 (6th Cir. 2004).  But "[p]roceeding pseudonymously is the exception rather than the rule,

and a plaintiff faces a heavy burden to avoid [his] obligation under the rules of civil procedure to

disclose [his] identity."  *Doe v. Univ. of Akron*, No. 5:15-cv-2309, 2016 WL 4520512, at *2 (N.D. Ohio

Feb. 3, 2016).  When evaluating such a request, courts consider: (1) whether the suit challenges

governmental activity; (2) whether prosecution of the suit will compel the plaintiff to disclose

information of the utmost intimacy; (3) whether the litigation compels the plaintiff to disclose an

intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiff is a

minor.  *Porter,* 370 F.3d at 560.  Whether to grant permission to proceed under a pseudonym lies

within the discretion of the court.  *Id.*

#### 1.  Challenge to governmental activity

Doe argues courts are more likely to permit pseudonyms when a plaintiff is suing to

challenge governmental activity because "the government is viewed as having a less significant

interest in protecting its reputation from damaging allegations than the ordinary individual defendant." (Doc. No. 3 at 3) (quoting *EW v. New York Blood Ctr.*, 213 F.R.D. 108, 111 (E.D.N.Y. 2003)).

While this may be true, "'[t]he simple fact that plaintiff sues a governmental entity does not give the court more reason to grant [his] request for anonymity.'" *Doe v. Univ. of Pittsburgh*, No. 1:17-cv-213, 2018 WL 1312219, at *2 (W.D. Mich. March 14, 2018) (quoting *Doe v. Pittsylvania Cnty., Va.*, 844 F. Supp. 2d 724, 730 (W.D. Va. 2012)). The Sixth Circuit upheld the denial of a plaintiff's request to proceed anonymously in *Univ. of Pittsburgh,* finding, where "the government activity is not applicable to the general public . . . [t]he identity of the suing party is [ ] relevant." *Doe v. Univ. of Pittsburgh,* 2019 U.S. App. LEXIS 17423, at *4 (6th Cir. June 10, 2019). That same rationale applies here. Doe's challenge to BGSU's disciplinary procedures is not a facial attack on their constitutionality, but instead a challenge to their constitutionality as applied to him in this instance. (*See* Doc. No. 15 at 37) ("Plaintiff is entitled to a Declaration that the [Code], as applied to Doe, violates the Due Process Clause . . .").

Further, Plaintiff also sued five individuals in both their official and personal capacities. (*See id.* at 1-2). Where a lawsuit alleges tortious conduct against state employees, the "[c]ourts are generally less likely to grant a plaintiff permission to proceed anonymously . . .." *Univ. of Pittsburgh*, 2018 WL 1312219, at *2. This is because the "mere filing of a civil action against other private parties may cause damage to their good names and reputation and may also result in economic harm." *Id.* (quoting *S. Methodist Univ. Ass'n of Women's Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979)).

Doe's reliance on *Porter* to show "numerous courts have granted motions for anonymity where public school officials were sued in their individual and official capacities" is misplaced. (Doc. No. 13 at 5). While *Porter* involved school officials and government policy, it also involved

religious beliefs which the Sixth Circuit noted were "perhaps the quintessentially private matter" and the rights of "very young children." *Porter*, 370 F.3d at 560-61. It was the combination of these considerations that led the court to permit the plaintiff to proceed anonymously,[25] but similar facts do not exist in this case.

### 2. Disclosure of information of the utmost intimacy

Doe next argues prosecution of this case would require him to disclose information of the utmost intimacy. (Doc. No. 3 at 4). He asserts that since this matter arises from the "highly publicized" death of Stone Foltz, he will be required to "disclose information that is highly sensitive and controversial in the present climate." (*Id*.).

At no point in Doe's briefings does he indicate what information of the utmost intimacy prosecution of this matter may require him to disclose. (*See* Doc. Nos. 3 & 13). Admittedly, Stone Foltz's death was a tragic and divisive event for the community, but Doe's suit takes issue with BGSU's internal disciplinary process and procedures, and I do not see how a suit regarding administrative procedure would require him to disclose intimate information.

Intimate information has been found in cases of religious beliefs, *Porter*, 370 F.3d at 560; sexual abuse, *Doe v. Mich. Dep't. of Corr.*, No. 13-14356, 2014 WL 2207136, at *10 (E.D. Mich. May 28, 2014), and for such things as use of birth control, abortion, sexual orientation, and welfare rights of illegitimate children. *See G.E.G. v. Shinseki*, No. 1:10-cv-1124, 2012 WL 381589, at *2 (W.D. Mich. Feb. 6, 2012). No information of such a personal nature is at issue in this litigation.

Further, despite Doe's assertion that "[n]umerous courts around the country permit college students to proceed anonymously," (Doc. No. 13 at 3), he cited no authority supporting that proposition from either this Circuit or any other. Indeed, it appears more common that college

---

[25] Doe also cites to *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981). Similar facts such as the rights of children and consideration of religious beliefs were at issue in *Stegall*. *Id.* at 186. The *Porter* court relied upon the rationale of *Stegall* to make its finding.

students challenging disciplinary procedures are required to proceed in their own name. *See Univ. of Akron*, No. 5:15-cv-2309, 2016 WL 4520512 (N.D. Ohio Feb. 3, 2016) (declining to permit student to proceed anonymously in lawsuit challenging dismissal procedures even where it might require disclosure of medical conditions and disabilities); *see also id.* at *4 (collecting cases of students challenging disciplinary procedures and yet, being required to proceed under their own name).

### 3.  Consideration of retaliation

Among Doe's arguments are allusions to the possibility of retaliation resulting from negative news and social media surrounding Stone Foltz's death.  (Doc. No. 3 at 4; Doc. No. 13 at 5-6).  But without more specific evidence of threats or retaliation towards Doe, "unsubstantiated fears of speculative harm are insufficient to outweigh the presumption of open judicial proceedings." *Univ. of Akron*, 2016 WL 4520512, at *4; *see also Ramsbottom v. Ashton*, No. 3:21-cv-272, 2021 WL 2651188, at *8 (M.D. Tenn. June 28, 2021) (denying request to proceed anonymously to former sex trafficking victim where the threat of danger or retaliation was speculative); *Doe v. Vanderbilt Univ.*, No. 3:20-cv-356, 2021 WL 6496833, at *2 (M.D. Tenn. March 11, 2021) ("But such unpleasantness, without threats indicating Mr. Doe is at risk of actual harm in real life, does not rise to the level of severity that justifies maintaining anonymity while prosecuting a federal lawsuit.").

Similarly, considerations of reputational harm or general "annoyance, embarrassment, economic harm and scrutiny from current or prospective employers" are no different than the risks other types of litigants commonly take when they bring a lawsuit under their own name.  *See Univ. of Pittsburgh*, 2018 WL 1312219, at *6, *aff'd* 2019 U.S. App. LEXIS 17423, at *4; *see also Stegall*, 653 F.2d at 186 ("The threat of hostile public reaction to a lawsuit, standing alone, will only with great rarity warrant public anonymity.").

Thus, I conclude that Doe has not carried his heavy burden to continue to proceed under a pseudonym.

## IV.  CONCLUSION

For the reasons stated above, I deny Doe's motion to proceed pseudonymously.  (Doc. No. 3).  I further deny Doe's motion for leave to file a second amended complaint as futile.  (Doc. No. 19 & 19-1).  Doe is ordered to re-file his FAC identifying himself by his legal name within 30 days of the date of this opinion and order.  If Doe fails to do so, the Court will dismiss Doe's complaint for lack of jurisdiction.  *See Citizens for a Strong Ohio v. Marsh*, 123 F. App'x 630, 637 (6th Cir. 2005) ("[T]he federal court lacks jurisdiction over the unnamed parties, as a case has not been commenced with respect to them.").

Furthermore, I grant in part and deny in part Defendants' motion to dismiss.  (Doc. No. 16). Count One is dismissed as to all Defendants in their official capacities.  Count Three is dismissed as to all individual Defendants in their official capacities.  Count Two is dismissed as to individual Defendants Rogers, Wilson, Webb, and Zilmer in their individual capacities.  Count Two is also dismissed as to Bullins for all claims under the Fifth and 14th Amendments, except for Doe's claim of a 14th Amendment due process violation stemming from the denial of his right to cross-examine his accuser.  Finally, Defendants' first motion to dismiss is denied without prejudice as moot.  (Doc. No. 14).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
