# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

CHASE WEISS
29600 Harvard Rd
Beachwood, Ohio  44122

       Plaintiff

v.

BOWLING GREEN STATE
UNIVERSITY
220 McFall Ctr.
Bowling Green, Ohio, 43403

And

CHRISTOPHER BULLINS
Office of the Dean of Students
301 Bowen-Thompson Student Union
Bowling Green, Ohio, 43403.
Attn:  Dean of Students

And

JEREMY ZILMER
Office of the Dean of Students
301 Bowen-Thompson Student Union
Bowling Green, Ohio, 43403.
Attn:  Associate Dean of Students

And

DR MAUREEN WILSON
College of Education and Human Development
310 Education Building
Bowling Green, Ohio, 43403.
Attn:  Associate Dean and Professor
And

Civil Action No: 3:22-cv-140

VERIFIED 1ST AMENDED
COMPLAINT FOR DECLARATORY
JUDGMENT, INJUNCTIVE RELIEF,
AND VIOLATION OF CIVIL RIGHTS

JURY DEMAND

JODI WEBB
Office of the Dean of Students
120 McFall Center
Bowling Green, Ohio, 43403.
Attn:  Associate Vice President for Student Affairs

And

RODNEY ROGERS
Office of the President
220 McFall Center
Bowling Green, Ohio, 43403-0010.
Attn:  President of Bowling Green State University

And

JOHN DOE(S)1-4

        Defendants

_____

## 1ST AMENDED COMPLAINT.

***Federal Rule of Civil Procedure 15. Amended and Supplemental Pleadings*** provides

that, "(1) Amending as a Matter of Course. A party may amend its pleading once as a

matter of course within: (A) 21 days after serving it, or, (B) If the pleading is one to

which a responsive pleading is required, 21 days after service of a responsive pleading or

*21 days after service of a motion under Rule 12(b), €, or (f), whichever is earlier*."

Accordingly, Plaintiff is filing his First Amended Complaint, contemporaneously with his

opposition to the Defendants' Motion to Dismiss, withing 21 days after service of

Defendants' Rule 12(b) motion.

## INTRODUCTION and BACKGROUND.

1.  Plaintiff **CHASE WEISS** brings this action for declaratory judgment, injunctive

relief, and violation of civil rights under 42 U.S. Code Section 1983, arising from,

Defendants' unconstitutional official conduct, and for damages, from Defendants' individual conduct, where said conduct includes but not limited to, conduct related to the University's policies, procedures, practices, regulations, restrictions and sanctions.

2.  This case arises out of the decision of Bowling Green State University (BGSU) to impose disciplinary sanctions against Plaintiff, Chase Weiss, in violation of his Constitutional, federal statutory, and contractual rights, including but not limited to the imposition of policies, procedures and actions by Defendants against Plaintiff, in violation of his Constitutional, federal statutory and contractual rights.

3.  Due to Defendants' official and individual conduct, Plaintiff is threatened with and has suffered with irreparable harm to his rights as protected under the Fourteenth Amendment of the United States Constitution and Article I of the Ohio Constitution. Section I, Article I of the Ohio Constitution provides that: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possession, and protecting property, and seeking and obtaining happiness and safety." This harm brought on by Defendants may only be remedied by a ruling from this Court.

**PARTIES.**

4. Plaintiff, **CHASE WEISS** (hereinafter referred to as "WEISS"), was an undergraduate college student who attended Bowling Green State University and attended Bowling Green State University through the Spring Semester of 2021.

a. WEISS is an Ohio resident with a residence at 29600 Harvard Road, Beachwood, Ohio, 44122. His driver's license and voter registration are from Ohio. He

attended BGSU and was enrolled as an undergraduate student seeking a Bachelor of Arts Degree.

       b. The disclosure of WEISS' [DOE'S] identity will cause him irreparable harm as this case involves matters of utmost personal intimacy, including the consideration of education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. Section 1232g; 34 CFR Part 99.

       c. WEISS completed a substantial part of his coursework towards an undergraduate degree at BGSU and was on target to graduate in either the Fall Semester of 2021 or the Spring Semester of 2022.

5.  Defendant**, BOWLING GREEN STATE UNIVERSITY** ("hereinafter referred to as "BGSU") is a public university created by the Ohio Legislature.

       a. BGSU is governed by a Board of Trustees who are responsible for the organization, administration and operation of BGSU which include, but is not limited to, establishing and monitoring the execution of policy that guides the administration, the oversight of academic programs and school procedures, budgets and general administration, and the employment of faculty and staff.

       b. BGSU lists its physical address for its main campus, on its website as Bowling Green State University, 220 McFall Ctr, Bowling Green, Ohio, 43403.

6.  Defendant, **CHRISTOPHER BULLINS** (hereinafter referred to as "BULLINS"), is the Dean of Students at BGSU.  He has a principal place of business located at the Office of the Dean of Students, 301 Bowen-Thompson Student Union, Bowling Green, Ohio, 43403.

a. Defendant BULLINS is sued in his official capacity for declaratory and injunctive relief and in his personal capacity for damages, for civil rights violations.

b. On information and belief, Defendant BULLINS is and was acting under the policies, procedures, and practices of BGSU.

c. Defendant BULLINS has and had the responsibility for the administering and operating aspects of the BGSU Student Code of Conduct and Judicial System.

d. Defendant BULLINS acted as the "Chair" (similar to a "Judge" in a legal court proceeding) in the conduct process at BGSU over the Plaintiff, as described herein in connection with the allegations presented in this lawsuit.

7. Defendant, **JEREMY ZILMER** (hereinafter referred to as "ZILMER"), is the Associate Dean of Students at BGSU. He has a principal place of business located at the Office of the Dean of Students, 301 Bowen-Thompson Student Union, Bowling Green, Ohio, 43403.

a. Defendant ZILMER is sued in his official capacity for declaratory and injunctive relief and in his personal capacity for damages, for civil rights violations.

b. On information and belief, Defendant ZILMER is and was acting under the policies, procedures, and practices of BGSU.

c. Defendant ZILMER has and had the responsibility for assisting with the administering and operating aspects of the BGSU Student Code of Conduct and Judicial System.

d. Defendant ZILMER acted as the "Student Conduct Administrator" (similar to a "Prosecuting Attorney or Plaintiff" in a legal court proceeding) in the conduct process

at BGSU over the Plaintiff, as described herein in connection with the allegations presented in this lawsuit.

8. Defendant, **DR. MAUREEN WILSON** (hereinafter referred to as "WILSON") is the Associate Dean for Faculty and Student Affairs and Professor of the College of Education and Human Development at BGSU. She has a principal place of business located at Bowling Green State University, 310 Education Building, Bowling Green, Ohio, 43403.

   a. Defendant WILSON is sued in her official capacity for declaratory and injunctive relief and in her personal capacity for damages, for civil rights violations.

   b. On information and belief, Defendant WILSON is and was acting under the policies, procedures, and practices of BGSU.

   c. Defendant WILSON has and had the responsibility for the assisting faculty and students with the administration process and faculty and student support at BGSU.

   d. Defendant WILSON was appointed to serve as a "Panel Member" (similar to a "Juror" in a legal court proceeding) in the conduct process at BGSU over the Plaintiff and was a member on the *panel* which was designated as the "University Conduct Committee" (similar to a "Jury" in a legal court proceeding and hereinafter referred to as the "UCC"), as described herein in connection with the allegations presented in this lawsuit.

9. Defendant, **JODI WEBB** (hereinafter referred to as "WEBB"), is the Associate Vice President for Student Affairs at BGSU. She has a principal place of business located at the Office of the Dean of Students, 120 McFall Center, Bowling Green, Ohio, 43403.

a.  Defendant WEBB is sued in her official capacity for declaratory and injunctive relief and in her personal capacity for damages, for civil rights violations.

b.  On information and belief, Defendant WEBB is and was acting under the policies, procedures, and practices of BGSU.

c.  Defendant WEBB has and had the responsibility for the policy development, administration, supervision of staff, budget development and oversight, program planning and implementation as well as providing direction to departments and programs within the student life arena at BGSU.

d.  Defendant WEBB acted as the "individual who decided the final outcome of the appeal by Plaintiff to the conduct outcome" (similar to a "the panel of three Judges that decide an Appeal" in a legal court proceeding) in the conduct process at BGSU over the Plaintiff, as described herein in connection with the allegations presented in this lawsuit.

10.  Defendant**, RODNEY ROGERS** (hereinafter referred to as "ROGERS"), is the President of the University for BGSU.  He has a principal place of business located at the Office of the President, 220 McFall Center, Bowling Green State University, Bowling Green, Ohio, 43403-0010.

a.  Defendant ROGERS is sued in his official capacity for declaratory and injunctive relief and in his personal capacity for damages, for civil rights violations.

b.  On information and belief, ROGERS is and was acting under the policies, procedures, and practices of BGSU.

c.  Defendant ROGERS has and had the responsibility for leading the administration at BGSU inclusive of the daily planning, organization and operation of all

aspects of the University's programs, and services in conformity with Board policies, the Ohio Department of Higher Education, Federal regulations, and State law, more specifically involving activities such as, (i) the appointment, removal, discipline, and supervision of all employees of the college in a manner consistent with the college personnel system and applicable collective bargaining agreements, (ii) the development and implementation of the University's philosophy with a strategic plan detailing its institutional mission, vision, goals, objectives, priorities and recourses, (iii) the creation of a climate that enhances student learning and personal growth, and,  (iv) the assurance of safety and maintenance of safety measures to all students, staff, faculty and visitors.

d.  Defendant ROGERS has been and was actively involved in the ancillary subject matter of this lawsuit, including but not limited to, the overseeing of the University's response and action(s) and/or inaction(s), in connection to the tragic event which occurred on or about March 4, 2021 at BGSU, and the subsequent conduct charges instituted by BGSU, some of which were reflected in the national media.

11.  Defendant(s). **JOHN/JANE DOE(S)** (hereinafter referred to as DOE-Defendant 1-4) are intended to be any and all individuals and/or entities, either in his/her or it's official capacity and/or individual capacity, who is or are liable to Plaintiff. These individuals may include, but are not limited to, other University administrators, faculty, staff, students, and/or legal counsel to individuals associated with the University, which were involved in the disciplinary process, but whose specific role(s) has or have not been yet determined.

a.  The name(s) and address(es) of DOE(S)1-4, are unknown, and despite a good

faith effort being made by the Plaintiff and its attorneys, the name(s) and address(es) of

DOE(S)1-4 could not be ascertained prior to the preparation and filing of this Complaint.

**<u>JURISDICTION AND VENUE</u>.**

12.  This case arises in part under the laws of the United States of America. More

specifically this Court has subject matter jurisdiction *pursuant to 28 U.S.C. Sections 1331*

*and 1343*, as this action arises under the First and Fourteenth Amendments to the United

States Constitution, in that it is brought to redress deprivations, under the color of state

law and of rights, privileges, and immunities secured by the United States Constitution;

*pursuant to 28 U.S.C. Section 1343*, in that it seeks to recover damages and secure

equitable relief under an Act of Congress, specifically, *42 U.S.C. Sections 1983 and 1988*

which provides a cause of action and remedies for the protection of civil and

constitutional rights; *under 28 U.S.C. Sections 2201 and 2202,* to secure declaratory

relief; *under 28 U.S.C. Sections 2201 and 2202, the Federal Rules of Civil Procedure 57*

*and 65* to secure injunctive relief and damages; and, *under 42 Section 1988*, to award

attorney fees.

13.  This Court may exercise supplemental jurisdiction over the state law claims because

such claims are so related to claims in the action within the original jurisdiction of the

Court that they form part of the same case or controversy under Article III of the United

States Constitution, pursuant to 28 U.S.C. Sections 1367.

14.  Venue for this cause of action is proper within this judicial district and division

pursuant to 28 U.S.C. Section 1391 as the Defendants are residents of the judicial district,

division, and  State where this action was instituted, and a substantial part of the events or

omissions giving rise to the claim asserted by Plaintiff, arose within this judicial district and division.

## FACTUAL ALLEGATIONS.

### *Tragic death of Stone Foltz.*

On information and belief:

15.   March 4th, 2021, the BGSU leaders of Pi Kappa Alpha fraternity (hereinafter referred to as "PIKE") hosted a Big/Little event during pledge week at BGSU.

16.  Approximately thirty individuals were present inclusive of nine new member pledges, and during said event, with the individuals who were present situated throughout a residence in different rooms and/or areas in an off-campus house.

17.  On March 7th, 2021, former new member pledge, Stone Foltz, tragically passed away after attending the event, from fatal ethanol intoxication.

### *BGSU Investigation.*

On information and belief:

18. On March 9, 2021, Alex Solis, Deputy Chief of Staff and University spokesperson, issued a statement to the public, in part, stating that, " BGSU continues its work with Greek student leaders and consulting with third parties to conduct a comprehensive review of all student organizations and activities *for more accountability and transparency*" and "we suspended all new member intake processes and on- and off-campus social events for Greek life and also announced plans to work with third parties to conduct a comprehensive review of all student organizations and activities *for more accountability and transparency*."

19. Defendant ROGERS stated in a press release, "BGSU will complete a thorough and fair investigation, seeking the truth and facts, and holding all students and groups responsible."

20. On March 15, 2021, the Ohio Attorney General's Office for BGSU Dave Yost approved the appointment and retained David DeVillers, with the firm of Barnes & Thornburg, LLP, as Special Counsel, *on behalf of the University*, to investigate the Pi Kappa Alpha International Fraternity event and determine whether or not it contributed to the death of BGSU student Stone Foltz. The findings were intended to be used by BGSU to determine if the University's Code of Student Conduct was violated by Pi Kappa Alpha fraternity or its members. BGSU failed to provide documents subject to a subpoena in a criminal matter in connection with DeViller's investigation, invoking "attorney-client privilege".

21. On April 2, 2021, Defendant ROGERS released correspondence stating that "I want to share new information regarding the conduct case." And, "The University worked with special counsel David DeVillers, a former U.S. Attorney for the Southern District of Ohio at the firm of Barnes & Thornburg, to pursue a thorough and fair investigation to seek the truth and facts regarding the alleged hazing activity on March 4." He further stated that, "Today, I am also pleased to appoint a ***presidential working group*** to focus solely on building a framework for our anti-hazing efforts and implement the upcoming recommendations from Dyad Strategies. I have asked *Dr. Maureen Wilson* [a Defendant in this matter] associate dean and professor in the College of Education and Human Development, and Chris Bullins [a Defendant in this matter], dean of students, to co-chair this group."

22.  DeVillers, in coordination with BGSU's general counsel Attorney Chavez and assisted by BGSU Associate Dean of Students, Defendant ZILMER [a Defendant in this matter], interviewed 32 individuals (seven PIKE pledges, 16 active members, one former member, Foltz's three roommates, three of Foltz's other friends who saw him on the evening of March 4th, 2021 and two designated drivers for new members.  There exist 32 recordings.

***Information provided for the Code of Conduct Hearings to WEISS, Respondents, and the UCC Panel.***

On information and belief:

23.  On May 14, 2021, Defendant ZILMER sent WEISS a charge letter written by him, citing violations of the Code of Student Conduct.  Defendant ZILMER alleged in the charge letter that the violations charged were alleged to have been done *"both directly and through tradition".*

24.  Defendant ZILMER included on the charge letter highly inflammatory and prejudicial statements not relevant to the charges brought against WEISS, more specifically: *"One new member died following the event, and other new members were severely intoxicated to the point of vomiting. The new member's, Stone Foltz, death has subsequently been attributed to "fatal ethanol intoxication during a hazing incident" per the Lucas County Coroner's Office."*

25.  On May 26, 2021, Joe B. Whitehead Jr. Ph.D. and BGSU Provost and Senior Vice President for Academic and Student Affairs, provided written testimony in support of Senate Bill 126 on behalf of BGSU and stated that, "*the University has worked <u>with students and families</u> to provide ongoing education and trainings* to ensure they understand hazing and its unfortunate consequences."

26. On June 7, 2021, Defendant BULLINS, gave WEISS notice of hearing for the conduct charges, set for July 7th and July 8th, 2021. His correspondence included the following language, "To ensure Respondents are afforded constitutional due process rights, a group hearing has been scheduled to resolve the alleged violations of the Code of Student Conduct charges against you and other Respondents facing the same or  similar Code of Student Conduct charges because those alleged violations arise from the same incident. *Each Respondent will have the opportunity to present information and cross-examine witnesses and other Respondents*."

27.  A student's right to procedural due process has been clearly established by law where a disciplinary proceeding results in suspension or expulsion. Courts have held that a student has the right to procedural due process in serious school disciplinary proceedings that result in suspensions or expulsions. ***Goss v. Lopez*, 419 U.SA. 565,576 (1975)**

28. The failure to provide any confrontation of the accuser at the conduct hearing, makes the proceeding against the accused fundamentally unfair.  ***Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir 2017); *Flaim*, 418 F.3d at 636**

29. A biased decisionmaker [is] constitutionally unacceptable, [and] our system of law has always endeavored to prevent even the probability of unfairness. ***Withrow v. Larkin*, 421 U.S. 35, 47 quoting *In Re Murchison*, 349 U.S. 133, 136 (1955)**

30.  On June 15, 2021, Defendant BULLINS advised WEISS that the hearing scheduled would include WEISS and seven other individuals with alleged code violations. The individuals who were charged with alleged code violations, including WEISS, were referred to as the "Respondents". When WEISS questioned concerns related to a group hearing and the relevancy of certain statements contained in his conduct charge letter,

Defendant BULLINS stated that it was his job to determine relevancy and that WEISS could submit objections in writing.

31. On June 17, 2021, WEISS received correspondence from Defendant BULLINS providing notice of proposed panel members for the UCC. Defendant BULLINS gave notice to WEISS that he could challenge a UCC member on the grounds of conflict of interest that might affect impartial consideration.

32. The Student Code of Conduct provides for a specific composition of individuals to make up the UCC Panel, which includes one faculty member, one staff member and three students. Defendants BGSU and BULLINS failed to form a UCC Panel consistent with the terms of the Student Code of Conduct.

33. WEISS discovered through his own investigation that Defendant BULLINS concealed or improperly designated the actual position of one of the proposed panel members; more specifically Defendant BULLINS indicated that Tanya Rider was a Staff member when in fact, she is a faculty member. Tanya Rider's position at the University is clearly designated on the BGSU website and Defendant BULLINS should have known or did know her position prior to naming her as a potential UCC Panel member.

34. On June 21, 2021, WEISS challenged panel member Tanya Rider based on the Student Code of Student Conduct specification for the make-up of the UCC, alleging her inclusion failed to conform with the prescribed composition as stated in the Student Code of Conduct. WEISS further discovered that prior to taking a teaching position at BGSU, proposed Panel Member, Tanya Rider had a twenty-year history in law enforcement as a detective seeking and procuring hundreds of criminal convictions. WEISS additionally challenged Rider claiming that the mind frame of an individual who has worked for a law

enforcement agency is to investigate and convict those individuals who are charged, alleging that she would not be able to be impartial. Finally, WEISS challenged the three graduate student proposed Panel Members based on the premise that they were not students as anticipated by the Code of Student Conduct since they were not representative as peers to WEISS and that they were paid interns. The three graduate students proposed as UCC Panel members are all graduate students and receive monies from the University as reflected on the BGSU website. WEISS expressed his concerns as to receiving a fair and impartial Panel with the preceding individuals on the UCC Panel.

35. On June 23, 2021, Defendant BULLINS notified WEISS that only Rider had been replaced.  In response to WEISS' concerns for an "impartial UCC" due to WEISS' inability to question them, BULLINS assured WEISS that UCC members were selected from a larger pool of UCC members based upon their availability for the date of the formal hearing.

36.  On June 22, 2021, WEISS made a written request for separation of Respondents based on reasons which included the complexity of the case, the substantial difference of facts associated with each Respondent, the significant disparity in the charges of each Respondent and the possible inability to cross-examine certain Respondents who may choose not to testify or to answer questions.

37.  On July 1, 2021, in response to WEISS' request for separation of Respondents, Defendant BULLINS denied said request stating in part, that "although your cases are being heard together, the UCC will give separate consideration to each of you. The fact that the UCC may find one of you responsible will not determine the UCC's decision as to any other Respondent charged." *He further stated that "Respondents will not be*

*compelled to testify".*   Therefore, WEISS was not guaranteed the right to cross-examine any Respondents that chose not to testify or who chose not to appear at the conduct hearing since Respondents would not be compelled to testify. Five of the Respondents chose not to appear and therefore, were not available for cross-examination although written summaries by ZILMER and audio tape-recordings of some of them were provided to the UCC panel.

38.  On June 23, 2021, WEISS made a written request for the removal of certain statements included in the text of his conduct charges based on relevancy and due to the inflammatory and prejudicial nature of the statements. The specific statements contained as a part of his conduct charges to which WEISS objected were, "At the event, members of the organization provided individual bottles of alcohol to new members and encouraged new members, both directly and through tradition, to consume most or all of their contents to the point of sickness thereby endangering the health of and attempting to cause harm to new members. One new member died following this event and other new members were severely intoxicated to the point of vomiting. The new member's, Stone Foltz, death has subsequently been attributed to "fatal ethanol intoxication during a hazing incident" per the Lucas County Coroner's Office."

39.  On July 1, 2021, in response to WEISS' request to remove the inflammatory and prejudicial statements that were not relevant to WEISS,  Defendant BULLINS indicated that "The information was included in the letters so that respondents could understand his [ZILMER'S] rationale in order to determine if he [WEISS] wanted to accept responsibility and resolve the matter via the informal conduct process. You [WEISS] will have the opportunity to address this information during the formal hearing and may direct

relevant questions to Mr. Zilmer as well as concerning his rationale for the statements."
Defendant BULLINS refused to remove the inflammatory and prejudicial language from
WEISS' conduct charge letter and summary prepared by ZILMER.

40. On July 1, 2021, WEISS received a hearing packet that contained information and
materials for the hearing to be held on July 7th and July 8th, 2021. WEISS was advised
that the UCC was provided with the same information and materials. The information and
materials included documentation allegedly related to one or more of the seven possible
Respondents that were given the opportunity to participate in the conduct hearing, which
included for each some or all of the following: (i) an Incident Report for each Respondent
prepared by Defendant ZILMER and/or BULLINS; (ii) a Summary of Investigation for
each of the Respondents drafted and prepared by Defendant ZILMER and/or BULLINS,
which contained alleged statements made by pledge(s), some of which was "hearsay"
(with statements not endorsed by any of the purported individuals named); (iii) a Conduct
Charge Correspondence(s) dated May 14, 2021, for each of the Respondents, prepared by
Defendant ZILMER (WEISS maintains that Conduct Charge Correspondence listed the
alleged violations, followed by highly inflammatory and prejudicial statements not
relevant to the charges); (iv) a Case Resolution Record prepared by Defendant ZILMER
and/or Defendant, BULLINS for each of the Respondents named; (v) tape-recordings of
interviews with some of the Respondents, most of whom were not available to be cross-
examined at the Conduct Hearing; (vi) a Bowling Green Police Department
Incident/Investigation Report the evening police responded to a call regarding Stone
Foltz; (vii) a Communications Event Report from a source not clearly labelled; (viii) a Pi

Kappa Alpha Fraternity New Member Handbook for the Alpha Mu Class, Spring 2021; and, (ix) a Witness List for the UCC Hearing provided by Defendant ZILMER.

41.  Both the UCC panel members and all Respondents were provided with the documents, recordings, and materials specified in numeral 43 above as part of the "hearing packet". A significant number of documents, recordings, and materials contained in the hearing packet included information interpreted by ZILMER and alleged statements made by third parties who were not present at the conduct hearings on July 7th and/or July 8th, 2021, reduced to writing by ZILMER.

42.  In fact, WEISS was not afforded the opportunity to cross-examine at least four individuals who were originally named as Respondents and who's summaries, and tape-recordings were provided to the UCC Panel for consideration.

43.  WEISS asserts that the UCC Panel received summaries, statements and/or tape-recordings of interviews in connection with eight Respondents, upon which the UCC Panel then, based and/or reached its conclusion, while WEISS was not afforded the right to cross-examine them since most of them did not appear and/or did not make themselves available to testify or to be cross-examined.

44.  WEISS' summary prepared by ZILMER and WEISS' conduct charge letter included alleged statements made by WEISS' alleged accuser and conclusions written by ZILMER.

45.  At the conduct hearing, ZILMER purported to make out-of-court statements allegedly made by WEISS' accuser. BULLINS allowed ZILMER to make said alleged out-of-court statements in front of the UCC Panel members.

46. WEISS was not afforded the opportunity to cross-examine his alleged accuser as the University failed to present him as a witness. WEISS' alleged accuser did not appear at the conduct hearing.

47.  WEISS' civil rights were violated because he was unable to cross-examine his alleged accuser, notwithstanding the fact that a written summary prepared by ZILMER and not verified by said accuser, was supplied to the UCC panel and therefore, considered. Additionally, WEISS' civil rights were further violated because he was unable to cross-examine the Respondents in connection with the unverified summaries prepared by ZILMER regarding their alleged actions and in connection, with numerous audio recordings of the Respondents who chose not to attend the conduct hearing.

***Code of Conduct Hearings.***

On information and belief:

48. Defendant ZILMER confirmed at WEISS' conduct  hearing that, 32 students were interviewed by David DeVillers.

49.  The BGSU Code of Student Conduct in place at the commencement of WEISS' attendance at BGSU was designated as "Bowling Green State University 2018-2019 Code of Student Conduct" which was replaced at a time unknown to Plaintiff, and later designated as "Bowling Green State University 2020-2021 Code of Student Conduct". The 'introduction' in the Code of Conduct includes language stating that it creates a set of expectations for student conduct, ensures a fair process for determining responsibility when student behavior may have deviated from those expectations, and provides appropriate sanctions when a student and/or student organization has violated the Code(s). The BGSU Student Conduct Goals, found on their website, include or included

the following statement, "To ensure fairness and justice through adjudication of student conduct in consideration of due process, federal and state laws and regulations, and campus policies and procedures."

49. The conduct hearing was held on July 7th and July 8th, 2021. Only two other Respondents and WEISS appeared on the first day. Only one other Respondent and WEISS appeared on the second day. Four Respondents failed to appear. Although the UCC panel members had recordings of statements made by these four other respondents and summaries generated by ZILMER for consideration, WEISS was not able to cross-examine the Respondents that did not appear.

50. At the conduct hearings, ZILMER called numerous witnesses and questioned two other Respondents regarding the allegations against WEISS.

51. None of the witnesses nor the Respondents questioned were able to provide any reliable and/or firsthand testimony against WEISS to support ZILMER'S accusations. When questioned by WEISS, all the witnesses stated that they did not have any evidence that WEISS specifically incited, aided or abetted hazing. One witness stated that he did not see WEISS on the evening of March 4, 2021. A second witness stated that he did not see WEISS the evening of March 4, 2021. A third witness stated that he could not recall interacting with WEISS the evening of March 4, 2021. A fourth witness stated that he didn't even know who WEISS was when questioned regarding WEISS' involvement. A fifth witness stated that he also didn't even know who WEISS was, when questioned regarding WEISS' involvement.

52. At the conduct hearing on July 7th, 2021, Defendant ZILMER admitted, that he had no evidence whatsoever that WEISS had any interaction with Stone Foltz. One

Respondent was questioned regarding WEISS and stated that he did not have any information in connection with WEISS regarding the evening of March 3, 2022.

***Tradition Testimony.***

On Information and Belief:

53. Defendant ZILMER alleged in the charge letter to WEISS that the violations charged against him were alleged to have been done *"both directly and through tradition"*.

54. Defendants ZILMER, BULLINS, ROGERS and BGSU were aware or should have been aware of the longstanding standing fraternity traditions involving hazing and alcohol, both nationally and at BGSU, and knowingly, intentionally or negligently permitted hazing involving alcohol usage to occur year after year, without notice of fraternity violations to incoming pledges, new active members, and/or their families.

55. Defendants, ZILMER, BULLINS, ROGERS and BGSU, were aware or should have been aware of the longstanding tradition involving hazing and alcohol usage at fraternity events designated as "Big Little" events. ZILMER admitted that he had extensive knowledge and experience based on his previous position at the University of Arizona. Defendants, ZILMER, BULLINS, ROGERS, and BGSU, permitted "Big Little" events to be scheduled and to take place by PIKE in connection with the students at BGSU. The Pi Kappa New Member Handbook contained a calendar which indicated that a Big/Little event was to take place on March 4, 2021. Deaths have historically occurred at Big/Little events nationwide, in the past, due to hazing and alcohol intoxication.

56. Defendants, ZILMER, BULLINS, ROGERS and BGSU, were aware or should have been aware of the longstanding traditions involving hazing and alcohol usage by the

PIKE fraternity at BGSU based on previous conduct charges and probation against PIKE at BGSU and failed to take proper action to stop said practices.

57. Defendants, ZILMER, BULLINS, ROGERS and BGSU, were aware or should have been aware of the longstanding traditions involving hazing and alcohol usage by PIKE fraternity at BGSU and failed to notify and inform the incoming 2019 Fall pledge group, including WEISS, of the ongoing violations and subsequent probation in place in connection with alcohol usage and hazing by PIKE, at the time of their initiation.

58. Defendants ZILMER, BULLINS, ROGERS and BGSU failed to consider their own responsibility by failing to take reasonable steps to stop or prevent the longstanding traditions involving hazing and alcohol usage by PIKE fraternity since 2018, as a mitigating factor to any of the charges in connection with hazing and alcohol use.

59. The failure of ZILMER, BULLINS, ROGERS, and BGSU to protect the incoming 2019 Fall pledge group, including WEISS, from hazing involving alcohol use, while PIKE was on probation for that very reason, served to perpetuate the longstanding traditions and hazing culture in connection with alcohol consumption. ZILMER, BULLINS, and WILSON failed to consider the mitigating circumstances created by BGSU.

***Education and Conflicting Hazing and Alcohol Policy.***

On Information and Belief:

60. Spark is or was an orientation program for new members of the fraternity and sorority community and new members are or were required to attend one session in order to receive information about the BGSU fraternity and sorority community and to be educated on concerns related to hazing, consent and alcohol consumption. It purportedly

addresses or addressed BGSU hazing and alcohol policy at new member orientation training.

61. The BGSU website calendar previously indicated that the purpose of Spark is to educate new members on concerns related to hazing, consent and alcohol consumption.

62. The BGSU website previously indicated that the Target Audience is "Students" and the Group is the "Office of the Dean of Students" in connection with the Spark orientation program.

63. In order to provide training for new pledge members, attendance at the Spark orientation program was required for all new fraternity members, including the entire 2019 Fall Semester pledge class of PIKE, which included WEISS.

64.  On the evening of November 6, 2019, the entire 2019 Fall Semester pledge class members of PIKE, including WEISS, appeared for the Spark orientation program, in order to receive the mandatory hazing and alcohol training. No school official appeared to lead and instruct the hazing training.

65. On November 6, 2019, after waiting for nearly forty-five minutes for the training to commence, WEISS contacted Stacey L. Allan, Assistant Dean of Students at BGSU, Fraternity and Sorority Life, hereinafter referred to as "ALLAN", in connection with his attendance and the attendance of the other 2019 Fall Semester PIKE pledge class members.

66.  On November 6, 2019, ALLAN advised WEISS and the 2019 Fall Semester PIKE, in writing, by email that due to his (or their) inconvenience, a PowerPoint was attached for review, and his (or their) presence would be marked as completed.

67. It is believed that ALLAN sent each and every student who was part of the 2019 Fall semester PIKE pledge class, the Spark Training hazing materials identified as a power point and attached to a written email excusing the student(s) from the training, on November 6, 2019.

68. Resultantly, WEISS and the 2019 Fall Semester PIKE new pledge members failed to receive mandatory hazing and alcohol training from BGSU, and instead received a written PowerPoint document on the important subject of hazing and alcohol consumption designated as "Spark New Member Orientation".

69. The Spark Training PowerPoint consist of instructional materials which includes "*Learning Outcomes*"  - "students will demonstrate personal responsibility and respectful behavior in a community environment and make informed decisions that will reduce high risk behavior."

70. The Spark Training PowerPoint consists of instructional materials inclusive of specific "*Scenarios"* and "*Action Steps*", which were provided to WEISS and the 2019 Fall Semester PIKE new pledge members.

71. Specifically, the Spark training materials provided to WEISS and the 2019 Fall Semester PIKE new pledge members, by BGSU, set out the following hypothetical scenario involving alcohol and underage freshmen attending a party:

"Some upper classmen are hosting a party. Some freshmen have confided in you that they don't drink and aren't huge "partiers" but since it's their teammates and they want to make a good impression, they are going to go. You are there and everyone seems to be having a good time until one of the seniors suggests a drinking game. You know the danger of consuming alcohol quickly and are concerned. Teammates start to gather around a table as one of them begins to explain the rules for the drinking game. The freshman who had confided in you initially decline but others start hassling them. You can see they're uncomfortable. They look at you. What do you do?"

72.  Specifically, the Spark training materials provided to WEISS and the 2019 Fall Semester PIKE new pledge members, by BGSU, indicated the following "Action Steps" following the hypothetical scenario specified above in "numeral 71":

"-Plan ahead – set a limit BEFORE going out.
-Encourage them to stop drinking (or take their drink away) when they've had enough.
-Stay with them to ensure they will be all right.
-Remove them from the situation.
-Get them to consume non-alcoholic and alcoholic drinks.
-Get them to alternate between non-alcoholic and alcoholic drinks.
-Get them to sip rather than gulp if they are drinking alcohol.
-Have them consume food while drinking alcoholic beverages.
-Tell them not to drink while taking medication.
-Never discuss problematic behavior when the person is under the influence.
Note: Responsible party hosting includes providing non-alcoholic beverages, serving food, limiting focus on drinking by not allowing drinking games or serving alcoholic punches, refraining from pushing alcoholic drinks, and limiting the quantity of alcohol available."

73. The Spark training instructions "on its face" expressly set out to train and educate WEISS and the other 2019 new pledge members, about an alcohol policy that condones underage consumption of alcohol where certain action steps are taken. The action steps did not include prohibiting the alcohol consumption of underage students.

74. Some Respondents indicated that many of the action steps specified therein were carried out on the evening of March 4, 2021.

75. The Spark training materials sponsored by BGSU and provided to WEISS and the other 2019 new pledge members, directly contradict the hazing and alcohol policy contained in the BGSU Student Code of Conduct. BGSU provides no training in connection with the Student Code of Conduct. The Spark training orientation is designed for fraternity and sorority members.

76. Nowhere does the Spark training materials educate the pledges and/or members that allowing an underage person to continue drinking in your presence may be considered a crime.

77. Nowhere does the Spark training materials educate the pledges and/or members that allowing an underage person to continue drinking in your presence may be a Student Code of Conduct violation.

78. Nowhere in Spark training materials is a pledge and/or member educated that not only that drinking a large amount of alcohol *can* cause death, but it actually *has* caused deaths, over a span of many many years on college campuses at fraternal events.

79. ZILMER, when asked about the Spark Orientation program, first stated that he was not aware of the program titled Spark but did admit that he understood that it was an orientation program for new members of fraternities and sororities. He further testified that that he was not familiar with the underage alcohol consumption hypothetical in the Spark training material. He also testified that he was not familiar with the suggested action steps.

80. ZILMER, further testified that, "I can't speak to what the curriculum says."

… "Again, I do not have knowledge of the Spark program."

81. BULLINS stated that, "as a representative his [ZILMER] role at the institution is student conduct. The office that you're talking about is fraternity/sorority life and there's no way an institution this size that a professor in the chemistry department knows what's happening in another department the same with administrative staff."

82. ZILMER and BULLINS denied any meaningful knowledge or responsibility for training in connection with alcohol use and hazing for active members, pledges, and/or family members, although the Spark Orientation Program appears to be sponsored by the Dean of Students.

83. The training program referred to as "Spark" was first introduced in 2019 and was sponsored by the Dean of Students, the department of which ZILMER and BULLINS, are and were a part of, when the training was offered.

84. ZILMER denied any meaningful knowledge of the Spark training materials inclusive of the language, describing the scenario where the use of alcohol at a fraternity party where there are freshmen (who are typically underage) and being encouraged to drink, is permissible so long as certain action steps are followed.

85. When asked by WEISS, ZILMER had no evidence that families of students received ongoing education and training to ensure they understood hazing and its unfortunate consequences as indicated by Joe B. Whitehead Jr. Ph.D. and BGSU Provost and Senior Vice President for Academic and Student Affairs.

86. The failure of ZILMER, BULLINS, ROGERS, and BGSU to protect the incoming 2019 Fall pledge group, including WEISS, from hazing involving alcohol use, while PIKE was on probation for that very reason, and at the same time, failing to properly educate the incoming pledges, in addition to, expressly teaching and supporting an alcohol policy for fraternity pledges and/or members, which was both questionable and dangerous, was negligent and in direct contradiction to the BGSU Student Code of Conduct.

***Outcome of Conduct Hearings***

On Information and Belief:

87. On July 12th, 2021, WEISS received an outcome letter which indicating that it was determined that he was responsible for all charges brought against him and sanctioned as follows: (i.) a suspension for eight years; (ii) a permanent notation of suspension added to

his academic transcript; (iii) an official HOLD placed on his registration file to prevent registering for classes; and, (iv) a prohibition from entering the BGSU campus or any University owned or operated facilities.

***Appeal.***

On Information and Belief:

88.  WEISS appealed the conduct decision dated July 12th, 2021 and timely submitted his appeal to Defendant, WEBB on July 20th, 2021.

89. On July 21st, 2021, one day after the Appeal was due and submitted to BGSU, WEISS discovered that BULLINS and WILSON were to co-chair a presidential working group focusing on building a framework for anti-hazing efforts together, commencing sometime after April 2, 2021. WEISS provided WEBB documentation from the Sentinel-Tribune regarding this information.

90.  That same day, WEISS then discovered that ROGERS had issued correspondence regarding his appointment of BULLINS and WILSON to work together on an anti-hazing committee. WEISS immediately submitted evidence of the correspondence written by ROGERS, to WEBB, for consideration in his appeal alleging that both BULLINS and WILSON, were not impartial decision makers.

91. BULLINS and WILSON, knowingly sat on an anti-hazing committee, together for more than 3 months devising anti-hazing policies, the very subject of the conduct charges while at the same time acting as decision makers at WEISS' conduct hearings, in connection with hazing allegations. BULLINS and WILSON were not impartial decision makers.

92. WEBB advised WEISS that since she received the information about BULLINS and WILSON, after the appeal deadline filing, and therefore, she would not consider the information in the appeal.

***Appeal Ruling.***

93. On July 30th, 2021, WEISS received his appeal response, denying his appeal from WEBB.

***News Media and Antihazing Report.***

On Information and Belief:

94. The same day of WEISS' appeal results, July 30th, 2021, the BGSU anti-hazing report was released to the news media.

95. The anti-hazing report lists as co-chairs, BULLINS and WILSON. ZILMER also participated on the anti-hazing committee. The fact that BULLINS and WILSON sat together on a panel is obvious and direct evidence that WEISS did not receive a fair and impartial factfinder and/or jury (Panel) in violation of his right to due process.

96. The anti-hazing reports specifies that BGSU President ROGERS announced the appointment of the presidential working group and was aware of BULLINS and WILSON'S participation as far back as April 2, 2021.

97. The anti-hazing report states that the working group members convened throughout the spring and summer to build the framework for BGSU's anti-hazing efforts. Said time period extended from April 2, 2021, through the appeal determination of WEISS' conduct case and was inclusive of the conduct hearings on July 7th and July 8th, 2021, and up to July 30, 2021.

98. The anti-hazing report also states that "it received dedicated support from working group members; staff in the office of the Dean of Students including ZILMER, …and staff in the Office of General Counsel; and members of central administration…."

99. The anti-hazing report seeks to adopt the Inter-University Council Presidents' Anti-Hazing Principles, which includes a "Zero-Tolerance Approach: Universities will impose severe sanctions against student organizations and individuals that engage in hazing." And "Automatic Dismissal: Universities will automatically dismiss students convicted of hazing."  BULLINS and WILSON created a policy where the punishment for hazing in the future will be met with zero-tolerance.

100. The school officials' (BULLINS and WILSON) participation on a committee developing a zero-tolerance policy for hazing is bias inducing and encourages the members of the committee to emphasize with the victims of hazing rather than an individual being charged in connection with hazing at the same time. BULLINS and WILSON can not be considered to be fair and impartial decision makers.

101. BULLINS as the Dean of Students, acting as Chair, was the individual responsible for presiding over the disciplinary hearing for WEISS, ultimately responsible for bringing charges against WEISS under the BGSU Student Code of Conduct and Judicial System, who made important decisions which affected the ultimate decision to suspend WEISS from BGSU for a period of eight years.

102.  BULLINS was further responsible for helping to enforce and manage the disciplinary hearings at BGSU.

103.  As such, BULLINS made decisions regarding the relevance and admission of evidence in connection with WEISS' disciplinary proceeding which affected the outcome.

104.  Over the objection of WEISS, BULLINS refused to remove prejudicial and inflammatory language specifically included in the text of the conduct charges, including a statement that Stone Foltz died as a result of alcohol poisoning and that the alleged actions were done out of tradition. The conduct charge letter containing the information was provided to the panel.

105.  WEISS was advised by BULLINS that he could address the prejudicial and inflammatory language at the disciplinary hearing. However, at the hearing, BULLINS repeatedly interrupted WEISS and stated that his questions were not relevant, rephrased questions posed to ZILMER, or testified for ZILMER.

106. BULLINS repeatedly questioned the relevance of the WEISS' questioning regarding tradition, in front of the panel, and often rephrased the questions or assisted ZILMER with his responses. ZILMER admitted that he was aware of the tradition that existed in connection with fraternity hazing/alcohol conduct violations, both outside of the University and at the University, prior to the event on March 4, 2021.

ZILMER admitted that he was aware of deaths that occurred nationwide as a result of fraternity hazing/alcohol activities.

107. BULLINS was also responsible for providing education and training to new member pledges joining fraternities and sororities and the Spark Orientation Training originated out of the Office of the Dean of Students.

108. As the Dean of Students, BULLINS was also the official responsible for the institution of the Spark Orientation Training at BGSU which was the training in place at the time the WEISS was a new member pledge.

109. The Spark Orientation Training provided instruction that defined action steps for the fraternity members to follow in the event of underage drinking at a fraternity event. The action steps specifically provided to the new member pledges, were both in contradiction with the Student Code of Conduct and authorized the fraternity members to break the law in connection with providing alcohol to underage individuals.

110.  Notwithstanding the hazing and alcohol policy that was tailored to fraternity members, BULLINS permitted the conduct charges to stem out of the BGSU Student Code of Conduct and ignored completely, the Spark Orientation Training policies.

111.  Defendant, ZILMER, as the Associate Dean of Students, was responsible for the investigation into WEISS' allegations and drafting of the conduct charges that led to WEISS' suspension for eight years. ZILMER was also responsible for assisting the Dean of Students in enforcing and managing the disciplinary hearings in connection with alleged fraternity misconduct.

112. ZILMER brought the conduct charges pursuant to the BGSU Student Code of Conduct although he was a part of the office of the Dean of Students where the Spark Orientation Training originated.

113. ZILMER repeatedly claimed that he was not aware of the Spark Orientation Training. He further testified that he did not work in Greek Life for BGSU and so he could not speak to the requirements for new members. He repeatedly claimed that he was not familiar with any of the curriculum or material with the program.

114. BULLINS repeatedly questioned the relevance of the Spark Orientation Training and stated that ZILMER did not have the authority to weigh in on fraternity life. BULLINS stated that ZILMER worked in the chemistry department and in an institution of this size, would not know what was happening in another department as such with fraternity life, so WEISS needed to ask a relevant question.

115. Both BULLINS and ZILMER failed to consider the contradictory hazing and alcohol policy for fraternity members in connection with the existing Student Code of Conduct hazing and alcohol policy, thereby rendering BGSU hazing and alcohol policy as vague and ambiguous, in violation of WEISS' constitutional rights.

116. BULLINS served on an anti-hazing committee with one of the panel members, WILSON, and when questioned by WEISS prior to the conduct hearings, assured him that he would have an impartial panel.

117. BULLIN'S and WILSON co-chairing, together with ZILMER'S participation together on the anti-hazing committee for three full months preceding the conduct hearing and thereafter, during the pendency of the disciplinary conduct until such time that a resolution was reached, lead to a disciplinary conduct hearing that was not meaningful as BULLINS and WILSON were not able to be impartial fact finders.

118. BULLINS, WILSON, and ZILMER, all should have been aware that serving on a committee in connection with anti-hazing and the subsequent formulation of a zero-tolerance policy, would affect the decision making of the Chair and the UCC panel member thereby affecting the outcome.

119. The patterns of decision-making are evidence that WEISS' constitutional rights were violated as, although there were substantially different degrees of participation in

the event on March 4, 2021, there was a 100% responsibility rate AND the sanctions were extreme in all instances.

120. The accuracy of the disciplinary proceeding outcome was flawed and doubtful, as there was not one witness that provided any evidence substantiating the charges brought against WEISS.

121. ZILMER presented an alleged summary of evidence against WEISS by an alleged accuser. The accuser was not presented as a witness at the disciplinary conduct hearing.

122. WEISS was not able to cross-examine his alleged accuser.

123. Although there was no evidence presented against WEISS by any witness that was present at the hearing or by WEISS himself, he was nevertheless found responsible for the charges.

124. Where there is a serious deprivation based on disciplinary misconduct, an accused has the right to cross-examination.

125. Where there is a problem of credibility, cross-examination of a witness is essential to a fair hearing.

126. WEISS' failure to be afforded the right to cross-examine his accuser was a violation of his civil rights.

127. WEBB was advised of the issue regarding the impartiality of BULLINS and WILSON based on the news article where ROGERS appointed them to serve on an anti-hazing committee together prior to a ruling on his appeal.

128. WEBB advised WEISS that she would not consider the impartiality of BULLINS and WILSON, because WEISS did not inform her by the due date for the appeal.

129. WEISS did not become aware of BULLINS, WILSON and ZILMER sitting on an anti-hazing committee together, until after the due date for the appeal.

130. WEBB'S refusal to consider the biased decision makers in WEISS' disciplinary proceedings, was a violation of his due process rights.

131. ROGERS specifically appointed BULLINS to co-chair on the anti-hazing committee although he knew he held the position that would act as the Chair on the disciplinary conduct hearing proceedings. He also knew that ZILMER would be the acting official to bring the charges against students associated with the incident of March 4, 2021.

132. ROGERS knew or should have known that WILSON was one of the officials named to be a UCC panel member in connection with the disciplinary conduct hearings, as the nature of the incident was at a national level of scrutiny.

133. ROGERS was actively overseeing a conduct hearing in which the Chair (Judge), entity presenting the charges (Prosecutor) and UCC panel (Jury), were all spending substantial time to create an anti-hazing policy which resulted in a zero-tolerance policy, which was ultimately the outcome for WEISS and the other Respondents, regardless of evidence presented and level of involvement.

134. The policies and procedures effectuated by BGSU and its administrators, and the subsequent outcome, resulted in a violation of WEISS' civil rights.

**COUNT I**

**DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES AND OHIO CONSTITUTIONS.**

135. Plaintiffs hereby repeats and incorporates by reference all of the allegations in the foregoing paragraphs of this Complaint as if set forth herein.

136. This Count is brought against all Defendants.

137. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, and provides that no person shall "be deprived of life, liberty, or property, without due process of law."

138. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

139. Section 16, Article I, Ohio Constitution, guarantees that every person injured in his lands, goods, person, or reputation shall have remedy by "due course of law."

140. The Due Process Clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the BGSU Code of Student Conduct.

141. BGSU has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

142. The Plaintiff is entitled under the Constitution of Ohio and the United States to a fair disciplinary process.

143. The Plaintiff's interests impacted by the results of the hearing are significant.

    a. Dismissal and Suspension for eight years from BGSU denies the Plaintiff the benefits of an education at BGSU to complete his undergraduate degree.

    b. Dismissal damages the Plaintiff's academic and professional reputation.

    c. Dismissal resulted in the loss of two scholarships awarded to the Plaintiff.

    d. Dismissal has affected the Plaintiff's ability to enroll at other institutions of higher education to complete his undergraduate degree and will affect his ability to enroll in other institutions to pursue further post-graduate education.

144. The Defendants have violated the Plaintiff's due process rights in the following manner:

a. BGSU conducted a fundamentally unfair disciplinary process by producing a bias UCC panel member and a bias Chair where, they participated on an anti-hazing committee four months prior to and through the entire conduct process, responsible for creating an anti-hazing policy which resulted in a zero-tolerance policy towards hazing. Both a UCC panel member and the Chair were not fair and impartial factfinders.

b. BGSU conducted a fundamentally unfair disciplinary process by permitting the submission of hearsay evidence to the UCC panel members and the use of hearsay evidence at the hearing without providing the Plaintiff the opportunity to effectively cross-examine witnesses.

c. BGSU conducted a fundamentally unfair disciplinary process by permitting the submission of hearsay evidence of the alleged accuser to the UCC panel members and the use of hearing evidence of the alleged accuser without providing the Plaintiff the opportunity to cross-examine his alleged accuser.

d. BGSU conducted a fundamentally unfair disciplinary process by permitting the use of highly prejudicial and inflammatory statements in the conduct charges and materials provided to the UCC panel for consideration in rendering a decision in connection with the conduct charges against WEISS.

e. BGSU conducted a fundamentally unfair disciplinary process by applying the BGSU Student Code of Conduct policies after implementing and providing training targeting fraternity members, including WEISS, in connection with a hazing and alcohol policy in direct conflict to the provisions in the BGSU Student Code of Conduct.

145. The Plaintiff and the Defendants have a dispute about whether the BGSU Code of Student Conduct, as applied to WEISS, violates the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Ohio Constitution.

146. The Plaintiff is entitled to a Declaration that the BGSU Code of Student Conduct, as applied to WEISS, violates the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Ohio Constitution.

147. Pursuant to 42 U.S.C. Section 2988, WEISS is entitled to his attorney fees and costs incurred in bringing this action.

**COUNT II**

**DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES AND OHIO CONSTITUTIONS.**

148. Plaintiffs hereby repeats and incorporates by reference all of the allegations in the foregoing paragraphs of this Complaint as if set forth herein.

149. The Count is brought against BULLINS, ZILMER, WILSON, WEBB, and ROGERS, in their individual capacities for damages.

150. The Defendants have acted under the color of law in violating the Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

151. The Defendants have acted intentionally and with callous disregard for Plaintiff's clearly established constitutional rights.

152. As a direct and proximate result of Defendants' violations of Plaintiff's constitutional rights, he has suffered severe and substantial damages. These damages include diminished earnings capacity, lost of career and business opportunities, litigation expenses, including attorney's fees, loss of reputation, humiliation, embarrassment,

inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

153. Pursuant to 42 U.S.C. Section 1983, Defendants, BULLINS, ZILMER, WILSON, WEBB, and ROGERS, are liable to the Plaintiff for his damages.

154. Pursuant to 42 U.S.C. Section 1988, the Plaintiff is entitled to his attorneys' fees and costs incurred in bringing this action.

## COUNT III

**INJUNCITIVE RELIEF.**

155. Plaintiffs hereby repeats and incorporates by reference all of the allegations in the foregoing paragraphs of this Complaint as if set forth herein.

156. This claim is brought against BULLINS, ZILMER, WILSON, WEBB, and ROGERS, in their official capacities for the injunctive relief sought for violations of constitutional rights.

157. The Defendants continued actions under the BGSU Code of Student Conduct against the Plaintiff under the BGSU Code of Student Conduct is causing substantial, immediate, and continuing damage to Plaintiff.

158. The Plaintiff is entitled to an Injunction from this Court prohibiting the imposition of, or reporting or, any disciplinary actions under the BGSU Code of Student Conduct against Plaintiff and name clearing.

**WHEREFORE,** Plaintiff seeks the following relief from the Court:

(i) On COUNTS I and II, Judgment in favor of Plaintiff declaring that the Defendants have violated the United States Constitution, the Ohio Constitution, and the Ohio Administrative Code, a judgment ordering the reversal of the decision and sanctions

and damages in an amount to be determined at trial, including pre-judgment interest, attorneys fees, expenses, costs, and disbursements as well as equitable and injunctive relief needed to reestablish Plaintiff's position and standing at BGSU as it was prior to his suspension;

(ii) On COUNT III, a judgment ordering the reversal of the decision and sanctions and damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, expenses, costs and disbursements, as well as all equitable and injunctive relief, prohibiting the continued imposition of, or reporting of, any disciplinary actions against the Plaintiff to any 3rd party (other academic institutions), name-clearing, injunctive relief needed to reestablish Plaintiff's position and standing at BGSU as it was prior to his suspension, and reinstatement and/or permission to enroll for admission at BGSU in the next fall calendar year.

And,

(iii) Court costs, and other reasonable expenses incurred in maintaining this action, including reasonable attorneys' fees as provided for by 42 U.S.C. Section 1998 and otherwise, and such other and further relief as the Court deems just, equitable, and proper.

Respectively submitted,

/s/Leslie A. Weiss                              /s/Michael K. Ashar
Leslie A. Weiss S. Ct. #0051857          Michael K. Ashar S. Ct. #0015307
Attorney for Chase Weiss                    Michael K. Ashar & Associates
HALBERG & ASSOCIATES CO., LPA    Attorney for Chase Weiss
198 East Aurora Rd                             13010 West Darrow Road
Northfield, Ohio  44067                        Vermilion, OH  44089-9368
Telephone  330-468-1056                     Telephone  440-967-2680
Email: halberglaw@netlink.net            Email mka@asharlaw.net

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading was filed electronically on October 31, 2022.

Notice of this filing shall be sent to all parties and/or his or her legal counsel, by

operation of the Court's electronic filing system. Parties may access this filing through

the Court's systems.

Respectively submitted,

/s/Leslie A. Weiss_____
Leslie A. Weiss S. Ct. #0051857
Attorney for Chase Weiss